**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JENNIFER JACOBS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Civil Action No. 15-2242 (RMC) |
| | ) |
| THE EXPERTS, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**OPINION**

The morning of September 16, 2013 started as a typical Monday in the District of Columbia. So it was at the Washington Navy Yard. While some headed to their offices or meetings, others drank their morning coffee at their desks and chatted about their respective weekends. This was the case for Frank Kohler, John Johnson, Mary Delorenzo Knight, Sylvia Frasier, Jennifer Jacobs, Jane McCullough, and Arthur Daniels, who reported early to their respective workstations on the third and fourth floors of Navy Yard's Building 197. It was also the case for Richard Michael Ridgell, who welcomed employees and visitors from his guard station on the first floor, and for Kenneth Bernard Proctor, who entered Building 197 to get his breakfast as he regularly did during his 22-year-career at the Navy Yard. Then, what seemed to be a typical Monday morning at the Navy Yard quickly became a dark and tragic moment in our Nation's capital and the lives of many families.

At approximately 8:00 a.m., Aaron Alexis, a civilian contractor working as a computer technician at the Navy Yard, entered Building 197 using a valid temporary access card and headed to his workstation in the fourth floor. Unknown to anyone, Mr. Alexis had a concealed sawed-off shotgun and ammunition in his backpack. He entered a restroom on the

fourth floor, pulled out the gun, and assembled it. As he came out, he opened fire indiscriminately. Mr. Alexis continued his carnage through various floors of the building until law enforcement officers fatally shot him on the first floor at 9:25 a.m. The shooting resulted in twelve deaths and four non-fatal injuries.

Before the Court are nine related lawsuits arising out of the Navy Yard shooting. Plaintiffs are the personal representatives of the estates (or surviving family members or heirs) of seven decedents, a survivor seriously injured by Mr. Alexis, and a survivor who was a witness to the shooting. Plaintiffs assert a combination of negligence and intentional tort claims against HP Enterprise Services, LLC (HPES), which provided information technology services to the U.S. Navy as a government contractor, and The Experts, Inc. (The Experts), which was an HPES subcontractor and Mr. Alexis's employer. In addition, three of the nine cases also include claims against HBC Management Services, Inc. and The Hana Group, Inc. (collectively HBC), which provided security services at Building 197 of the Navy Yard.

The question raised by these related lawsuits is whether these companies can be held liable for money damages to the families of the decedents and to the two survivors for the criminal acts of Aaron Alexis. For the reasons that follow, the Court will grant in part and deny in part the motions to dismiss filed by HPES and The Experts. The Court will grant HBC's motion to dismiss. Only Plaintiffs' claims of negligent retention and supervision against HPES and The Experts will remain and proceed to discovery.

# I. FACTS[1]

In seven of the nine cases, the complaints seek damages for the deaths of those murdered by Mr. Alexis:

- *Delorenzo v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-0216-RMC

- *Frasier v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1492-RMC

- *Proctor v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1494-RMC

- *Halmon-Daniels v. The Experts, Inc.*, Case No. 1:15-cv-1501-RMC

- *Kohler v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1636-RMC

- *Ridgell v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1637-RMC

- *Zagami v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1638-RMC

The remaining two complaints seek damages for injuries (mental, emotional, and physical) suffered during the shooting:

- *McCullough v. HP Enterprise Servs., LLC*, Case No. 1:15-cv-1639-RMC

- *Jacobs v. The Experts, Inc.*, Case No. 1:15-cv-2242-RMC

Plaintiffs assert common law negligence claims against both HPES and The Experts for failing to anticipate and prevent the mass shooting by Mr. Alexis, as well as claims of negligent hiring, retention, supervision, undertaking, and credentialing. Plaintiffs also rely on various statutes, regulations, and policy manuals to assert negligence *per se* and statutory duty

---

[1] These facts are taken directly from the Complaints in the nine related cases. The Court has also considered documents incorporated by reference in the Complaints. *See EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997) (stating that courts may consider documents incorporated by reference in a complaint, as well as any matters of which the Court may take judicial notice, without converting a motion to dismiss into a motion for summary judgment); *see also Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 (D.D.C. 2011) (explaining that courts may consider such documents even if they are not produced "by the plaintiff in the complaint but by the defendant in a motion to dismiss") (citations and internal quotation marks omitted).

claims against HPES and The Experts.  In addition, Mr. Proctor and Ms. McCullough allege that HPES and The Experts are vicariously liable for Mr. Alexis's intentional torts of assault and battery.  Finally, Ms. Kohler, Ms. Zagami, and Ms. Jacobs also aver negligence claims against the security company, HBC.  Richard Ridgell worked for HBC and his estate does not sue his former employer.  None of the other Plaintiffs worked for any of the Defendants.

The nine Complaints include lengthy factual allegations regarding Mr. Alexis's history and the sequence of events prior to the mass shooting of September 16, 2013.  Plaintiffs rely extensively on government investigations, particularly by the Navy, and adopt government determinations, in many instances *verbatim*, as part of their own allegations.

**A.  History of Mr. Alexis Prior to his Employment with The Experts [2]**

Plaintiffs allege that Mr. Alexis had an arrest record long before he was hired by The Experts and assigned to work at the Washington Navy Yard.  On June 3, 2004, the Seattle Police Department arrested Mr. Alexis for allegedly shooting out the rear tires of a construction worker's vehicle.  Mr. Alexis told the police that the construction worker had disrespected him and that he had a blackout fueled by anger.  Mr. Alexis was charged, but never prosecuted or convicted, with malicious mischief.  Plaintiffs also allege that, in 2006, Mr. Alexis was investigated because the tires of five vehicles in Mr. Alexis's apartment complex were slashed.  Mr. Alexis was not arrested or charged on this occasion.  In 2007, the Office of Personnel Management ran a records check on Mr. Alexis, who was serving in the Navy.  The records check revealed the 2004 arrest in Seattle.  Mr. Alexis provided a written account of the 2004

---

[2] For purposes of ruling on the motions to dismiss, the Court accepts these factual allegations as true, noting that Plaintiffs failed to properly allege that HPES or The Experts knew or should have known about these facts about Mr. Alexis prior to his employment with The Experts.

incident to the Naval Recruiting District, which also conducted an inquiry into relevant court documents.

On August 10, 2008, Mr. Alexis was removed from a nightclub in DeKalb County, Georgia. Mr. Alexis was screaming profanities and acting in a hostile manner. He was arrested for disorderly conduct, but never prosecuted or convicted. On July 12, 2009, in Fort Worth, Texas, Mr. Alexis received a non-judicial punishment by the Navy and was reduced one pay grade after he jumped from a staircase while reportedly intoxicated and fractured his right ankle. "There was no police involvement in this incident." Frasier Compl., Case No. 15-1492 [Dkt. 1] ¶ 21. On September 5, 2010, he was again arrested in Fort Worth for discharging a firearm in his residence. The bullet went through the ceiling of Mr. Alexis's apartment into a neighbor's apartment. Mr. Alexis told the police that it was an accident and that he was cleaning his firearm. Mr. Alexis was never charged or convicted for discharging the firearm. His Navy Commanding Officer initiated administrative proceedings against Mr. Alexis to separate him from the Navy, but the proceedings did not continue once it became clear that Mr. Alexis was not going to be charged with a crime.

On December 2, 2010, Mr. Alexis requested separation from the Navy under the Enlisted Early Transition Program. On December 9, 2010, the Bureau of Naval Personnel approved Mr. Alexis's request. Mr. Alexis was honorably discharged from the Navy and received a re-entry code of RE-1, which made Mr. Alexis eligible to reenlist in the Navy or another armed service. In addition, Mr. Alexis received a Navy Reserve Identification and Privilege Card.

### B. Employment History of Mr. Alexis with The Experts

In September 2012, Mr. Alexis applied for employment as a computer technician with The Experts, a subcontractor of HPES, which performed work for the Navy under the

Navy-Marine Corps Intranet Continuity of Service Contract (Contract).[3] The Contract invoked the National Industrial Security Program Operating Manual (NISPOM), which defined the security requirements for cleared defense contractors, and required HPES and The Experts "to develop and maintain a program that ensures all pertinent derogatory information regarding cleared personnel is forwarded for consideration in the personnel security clearance determination process." Proctor Compl., Case No. 15-1494 [Dkt. 1] ¶ 18. Specifically, NISPOM required cleared contractors to convey any derogatory information about Contract personnel to the Department of Defense's (DoD) Central Adjudication Facility via "incident reports" through the Joint Personnel Adjudication System, "which is the DoD system of record for personnel security clearance adjudication and management." Id. ¶ 19.

Under NISPOM's terms, Mr. Alexis already had a valid security clearance when he was hired because he had not been separated from the Navy for more than 24 months. In addition to NISPOM's security requirements, HPES required The Experts to conduct a pre-employment eligibility background check, "which involved a drug test, a motor vehicle driving record check, and criminal convictions checks." Id. ¶ 24. Mr. Alexis was found to be suitable and given his honorable discharge, re-entry code of RE-1, and security clearance, The Experts hired Mr. Alexis as a computer technician assigned to work on the Contract. Plaintiffs allege that Mr. Alexis should not have been found eligible for the position because the pre-employment background check should have revealed Mr. Alexis's arrests.

Mr. Alexis worked for The Experts from September to December 2012 on various projects in Texas, California, and Japan. On December 27, 2012, Mr. Alexis resigned. Plaintiffs

---

[3] For purposes of the motions to dismiss, HPES and the Court treat Mr. Alexis as an employee or contractor of both HPES and The Experts.

make no allegations concerning Mr. Alexis's conduct or behavior during this short stint. On June 27, 2013, Mr. Alexis re-applied for the same position. Since Mr. Alexis still had a valid security clearance, The Experts merely conducted the tests required by its contract with HPES — namely a drug test, a motor vehicle driving record check, and a criminal convictions check. Once again, Mr. Alexis was found to be suitable for the job and was rehired on July 2013 and assigned to work in Norfolk, Virginia. Once again, Plaintiffs allege that "The Experts['] background check failed to uncover Alexis's prior arrest record and w[as] insufficient." *Id.* ¶ 27.

### 1. Events of August 2013

In August 2013, Mr. Alexis was reassigned to a project at the Naval Undersea Warfare Center in Newport, Rhode Island. On August 4, Mr. Alexis was at the Norfolk airport awaiting his flight to Providence, Rhode Island, when he called his project coordinator at The Experts to report that he was angry at a male who was seated across the aisle and was making fun of him. The project coordinator was able to calm Mr. Alexis down and persuaded him to get away from the individual and seek help from airport security. On August 5, 2013, the project coordinator reported the call to the company's Contract team. Later that day, Mr. Alexis contacted the company's travel coordinator to complain about noise in his hotel, the Residence Inn in Middletown, Rhode Island. Mr. Alexis wanted to move to the Navy Gateway Inns & Suites in Newport, which was approved.

Two days later, on August 6, 2013, at 6:00 p.m., Mr. Alexis called the travel coordinator for The Experts to complain that three individuals, two men and one female, had followed him from the Residence Inn to the Navy Gateway Inns & Suites. Mr. Alexis claimed that they "were talking about him through the walls of an adjacent room" and were using an "ultrasonic device that was physically pinning him to the bed" and keeping him awake. Kohler

Compl., Case No. 15-1636 [Dkt. 1-1] ¶ 37; Ridgell Compl., Case No. 15-1637 [Dkt. 1-1] ¶ 35;

Zagami Compl., Case No. 15-1638 [Dkt. 1-1] ¶ 37; Jacobs Compl., Case No. 15-2242 [Dkt. 1-1]

¶ 47. Mr. Alexis made a similar report to the Contract's program manager for The Experts. At

8:45 p.m., the travel coordinator conveyed the information to the desk clerk at the Navy Gateway

Inns & Suites and expressed her concern that Mr. Alexis could harm someone. Shortly

thereafter, the travel coordinator contacted the Contract's program manager to report the

information concerning Mr. Alexis.

   In response, the desk clerk at the hotel contacted the Naval Station Newport

Police to relay the information and ask that a police officer be assigned close to the hotel in case

Mr. Alexis attempted to hurt someone.[4] When the police officers responded to the call and

arrived at the hotel, they discovered that Mr. Alexis had dismantled his bed because he believed

that someone was hiding under it. In addition, Mr. Alexis had taped a microphone to the room's

ceiling to record the voices of the individuals that followed him to the hotel and were talking

about him. Mr. Alexis was not arrested or placed in protective custody. At 9:18 p.m., Mr.

Alexis told other police officers that someone had implanted a chip in his head and was using

microwave signals to restrict his movements and keep him awake.

   Later that evening, the Contract's program manager, her immediate manager, and

the Facility Security Officer (FSO)[5] for The Experts, held a conference call to discuss the

situation with Mr. Alexis. The Experts management team decided that Mr. Alexis should leave

Newport and return to Fort Worth so he could rest. The program manager contacted Mr. Alexis

---

[4] The Police Department received a total of four calls from and about Mr. Alexis –– specifically, on August 6 at 2:00 a.m., 9:18 p.m., and 10:16 p.m., and August 7 at 2:54 a.m.

[5] The FSO is a company officer who reported directly to the Chief Operating Officer and was responsible for managing the security program under the Contract for The Experts.

to inform him of the decision, although Mr. Alexis wanted to stay.  At 11:35 p.m., the FSO

accessed the Joint Personnel Adjudication System to cancel "the visit notification for [Mr.]

Alexis that the FSO previously established for access to [Newport's Naval Undersea Warfare

Center]."  Proctor Compl. ¶ 43.

On August 7, 2013, at 1:12 a.m., the program manager emailed HPES

representatives and the rest of the Contract's management team for The Experts to report that

Mr. Alexis would not complete his Newport assignment because he was not feeling well and that

she had booked return airfare for Mr. Alexis.  Around 3:00 a.m., Mr. Alexis called the HPES

second shift supervisor stating that he was being followed and needed to move out of his room.

Mr. Alexis asked the HPES supervisor if he could stay in her room at the Marriott hotel in

Newport.  The supervisor, who knew Mr. Alexis from previously working together on the project

in Japan, agreed to let him stay in her room.  When Mr. Alexis arrived at the Marriott hotel, he

told the supervisor that three individuals who traveled on the same plane from Norfolk followed

him to the Residence Inn and then to the Navy Gateway Inns & Suites and were threatening him

and keeping him awake.

Mr. Alexis also told the HPES supervisor that the same people had followed him

to the Marriott hotel and checked into the room below.  Mr. Alexis asked the supervisor if she

could hear their voices, to which she replied that she could not.  The supervisor dismissed Mr.

Alexis's story and went to sleep.  Mr. Alexis called the City of Newport Police to report that

people were following him.  The police responded to his call at 6:20 a.m. and Mr. Alexis

explained that he had had a verbal altercation with an unknown individual at the Norfolk airport

and that this individual sent three people to follow him and keep him awake by making noises,

talking to him, and sending vibrations through his body with a microwave device.  The City of

Newport Police made a report of Mr. Alexis's allegations.  At 9:30 a.m., the Newport Police Officer-in-Charge contacted the Naval Station Police Sergeant to relay the information concerning Mr. Alexis and faxed him a copy of the report with a note saying, "FYI on this.  Just thought to pass it on to you in the event this person escalates."  Proctor Compl.  ¶ 52.

Between 10:00 and 10:30 a.m., the HPES supervisor contacted her lead supervisor at HPES to report Mr. Alexis's behavior and claims, to which the lead supervisor responded that The Experts had decided that Mr. Alexis would be withdrawn from his Newport assignment. When the HPES second shift supervisor returned to her room, Mr. Alexis told her that the three individuals were now in the room above them.  Mr. Alexis wanted to acquire a radar gun to hear what they were saying.  The HPES second shift supervisor called the lead supervisor again after lunch to report her conversation with Mr. Alexis.  She also later told a co-worker at HPES about Mr. Alexis's behavior and the surrounding events.

Later that day, on August 7, the Human Resources (HR) Director and the Legal Counsel for The Experts initiated an investigation into Mr. Alexis's claims.  The HR Director contacted the HPES second shift supervisor, as well as the Middletown Police Department.  The HR Director believed that "the Middletown Police Department provided police coverage for all of the hotel in which Alexis resided while in Newport, Rhode Island."  Proctor Compl. ¶ 60. However, no reports were obtained from Middletown because it was the wrong police department. [6]  At 11:39 p.m., the FSO for The Experts accessed the Joint Personnel Adjudication System and entered a "Debrief" action, thereby formally indicating that Mr. Alexis no longer required access to classified information or to the Naval Undersea Warfare Center.  Because Mr.

---

[6] The police departments that investigated Mr. Alexis's claims were the Naval Station Newport Police and the City of Newport Police Departments.

Alexis was removed from his Newport assignment, he left Newport and checked in that night at the Best Western hotel at the Providence airport. On August 8, 2013, Mr. Alexis traveled to Fort Worth, Texas.

On August 9, 2013, the HR Director for The Experts contacted Mr. Alexis's mother, who indicated that Mr. Alexis "had been suffering from paranoia for a long time, that this was not the first episode he had experienced, and that he required mental health treatment." Kohler Compl. ¶ 52; Ridgell Compl. ¶ 50; Zagami Compl. ¶ 52; Jacobs Compl. ¶ 63. Later that day, the HR Director met with the FSO and the rest of The Experts' management team on the Contract; that group concluded that Mr. Alexis should rest before his next assignment. The Experts, particularly the FSO, decided not to file an adverse information report with DoD's Central Adjudication Facility because "the information collected about [Mr.] Alexis was based on rumor and innuendo, and therefore a report to the government should not be made, since doing so may infringe on [Mr.] Alexis's privacy rights." Proctor Compl. ¶ 65.

At 2:55 p.m., on August 9, 2013, the FSO entered an "indoctrination" action, indicating that Mr. Alexis "was an individual [with] authorized access to classified information under the cognizance of The Experts." *Id.* ¶ 66. Thereafter, Mr. Alexis was assigned to four projects at different locations — specifically, (1) Williamsburg, Virginia from August 12-16, 2013; (2) Newport, Rhode Island from August 19-23, 2013; (3) Carderock, Maryland from August 26-30, 2013; and (4) Crystal City, Virginia from September 3-6, 2013. Plaintiffs allege that Mr. Alexis was allowed to return to work without any proof of counseling or mental health

treatment. There are no allegations of unusual behavior during Mr. Alexis's deployments to Williamsburg, Newport, Carderock, and Crystal City.[7]

### 2. Events of September 2013

On September 9, 2013, The Experts assigned Mr. Alexis to the Washington Navy Yard. This was his fifth assignment since the events of August 4-7, 2013. Plaintiffs allege that "HPES and The Experts provided Mr. Alexis access to the Navy Yard facility and Building 197 on the basis of his 'SECRET' security clearance" and without conducting "any additional background checks or fitness for duty checks or examinations" or requesting proof of mental health treatment. Kohler Compl. ¶ 58; Ridgell Compl. ¶ 56; Zagami Compl. ¶ 58; Jacobs Compl. ¶ 69. "During the week of September 9, 2013, other than leaving a disk in a classified computer, no performance issues were noted." Proctor Compl. ¶ 69.

On September 14, 2013, Mr. Alexis purchased a Remington 870 12-gauge shotgun and ammunition in Lorton, Virginia. He then purchased a hacksaw and other items at a home improvement store. Mr. Alexis sawed off the shotgun so that he would be able to carry it in his bag and conceal it. He also carved the words "my ELF [extremely-low frequency] weapon," "better of [sic] this way," "not what y'all say," and "end to the torment" into the

---

[7] The only instance alleged was an e-mail exchange on September 1, 2013 between Mr. Alexis and the president of Freedom from Covert Harassment and Surveillance (FFCHS), in which Mr. Alexis claimed that he was subject to "constant bombardment from some type of [extremely low-frequency or] ELF weapon, that had almost cost him his job." Proctor Compl. ¶ 68 (internal quotation marks omitted). The allegation is irrelevant to Plaintiffs' claims because FFCHS has no connection with Defendants and there are no factual allegations to show that Defendants knew or should have known about this e-mail exchange. FFCHS self-identifies as a non-profit organization that helps "victims" or "targets" of "Remote Brain experimentation, Remote Neural Monitoring of an entire Humans Body [sic]; manipulated by such evil technologies as Patented Voice-to-(Human)-Skull (the forceful 24/7 of projected noise to a citizen's head) even to Remote Burns by high powered lasers, or burns by Directed Energy and more." FFCHS, What We Do, https://www.freedomfchs.net/what-we-do/ (last visited Aug. 2, 2016).

shotgun.  Frasier Compl. ¶ 47.  No Plaintiff, victim, or Defendant knew these facts until the later government investigation.  On September 16, 2013, at 7:44 a.m., Mr. Alexis arrived in a rental car at the 6th Street gate of the Navy Yard and used his valid common access card to enter. After parking his car, at approximately 8:00 a.m., he used his valid temporary building pass to enter the lobby of Building 197, passing by the HBC guard station.  Mr. Alexis did not pass through any metal detectors and the HBC guards did not search his belongings.  He was carrying a backpack to conceal the gun and ammunition.

Mr. Alexis headed to the restroom on the fourth floor.  At 8:15 a.m., Mr. Alexis exited the restroom and began shooting people indiscriminately.  Using the shotgun and a Beretta handgun that he took from Officer Ridgell, one of the decedents and an employee of HBC, Mr. Alexis killed twelve individuals and injured four others.  After over an hour of carnage, Mr. Alexis was shot and killed by a police officer at 9:25 a.m.  A note was found in Mr. Alexis's computer stating, "ultra low frequency attack is what I've been subject to for the last three months, and to be perfectly honest that is what has driven me to this."  Frasier Compl. ¶ 47.

## C.  Procedural History

Following the events of September 16, 2013, the Navy and DoD conducted separate extensive investigations and issued lengthy reports on Mr. Alexis and the shooting. Plaintiffs rely on these reports in their pleadings and cite, in many instances *verbatim*, the reports' determinations.  The nine related cases came before the Court in diverse ways.  One of the complaints (Delorenzo) was originally filed in a Florida state court.  It was then removed to the U.S. District Court for the Middle District of Florida, and eventually transferred to this Court. Three of the complaints (Frasier, Proctor, and Halmon-Daniels) were directly filed in this Court, and the remaining five (Kohler, Ridgell, Zagami, McCullough, and Jacobs) were originally filed in Superior Court for the District of Columbia and then removed here.

13

This Court has jurisdiction over the nine complaints pursuant to 28 U.S.C. § 1332 because the parties in each case are citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs. Moreover, the parties agree that the venue properly lies in this Court. D.C. tort law controls this diversity action. The Experts moves to dismiss the nine complaints for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). HPES and HBC move to dismiss the complaints against them under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs filed their respective oppositions, to which Defendants replied. In addition, at the Court's request, HBC and Plaintiffs Kohler, Zagami, and Jacobs filed supplemental briefs concerning the relevance of HBC's security contract with Naval Facilities Engineering Command to the negligence claims against HBC. Finally, on August 16, 2016, the Court held oral argument in open court and gave the parties ample time to expand on their arguments and discuss the various grounds for dismissal.[8] Defendants' motions to dismiss are fully briefed and ripe for resolution.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a complaint, or any portion thereof, for lack of subject matter jurisdiction. Fed. R. Civ.

---

[8] Counsel for each defendant had the opportunity to argue its own motion to dismiss. On the Plaintiffs' side, counsel for Mr. Proctor argued the issues of heightened foreseeability and the claims of negligent hiring, retention, and supervision on behalf of all Plaintiffs. Counsel for Plaintiffs Kohler, Ridgell, Zagami, and Jacobs addressed the political question doctrine on behalf of all Plaintiffs. Counsel for these Plaintiffs also argued their unique claims on their own behalf, specifically those based on the D.C. Industrial Safety Act, D.C. Code. §§ 32-801 to -812, against HPES and The Experts, as well as the negligence claim against HBC. Finally, counsel for Plaintiff Delorenzo argued on her behalf a negligence claim against HPES and The Experts based on the criminal prohibition against firearms in federal facilities, 18 U.S.C. § 930. *See generally* 8/16/2016 Hr'g Tr.

P. 12(b)(1).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is both a statutory and an Article III requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003).  The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction") (internal citations omitted).

Dismissal on the basis that Plaintiffs' claims present non-justiciable political questions constitutes a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) and "not an adjudication on the merits." *Gonzalez-Vera v. Kissinger,* 449 F.3d 1260, 1262 (D.C. Cir. 2006).  When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court should "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).  A court may consider materials outside the pleadings to determine its jurisdiction. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).  A court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of*

*Engineers*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)); *see also Macharia v. United States*, 238 F. Supp. 2d 13, 20 (D.D.C. 2002), *aff'd*, 334 F.3d 61 (2003) (in reviewing a factual challenge to the truthfulness of the allegations in a complaint, a court may examine testimony and affidavits). In these circumstances, consideration of documents outside the pleadings does not convert the motion to dismiss into one for summary judgment. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 21 (D.D.C. 2003).

### B. Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face. Fed. R. Civ. P. 12(b)(6). A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. A court must treat the complaint's factual allegations as true, "even if doubtful in fact," *id.*, but a court need not accept as true legal conclusions set forth in a complaint, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. A complaint must allege sufficient facts that would allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by

reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## III.  ANALYSIS

### A.  Subject Matter Jurisdiction – Political Question Doctrine

The Experts argues that the claims against it should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) because they raise non-justiciable political questions. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 230 (1986). The underlying rationale is that "courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1379 (D.C. Cir. 1981).

"The political question doctrine is 'primarily a function of the separation of powers.'" *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 258 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005) (quoting *Baker v. Carr,* 369 U.S. 186, 210 (1962)). In *Baker*, the Supreme Court enumerated six factors that could render a case non-justiciable:

> Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment of multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217 (numbers not in original); *see also Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 313 (D.C. Cir. 2014). "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Baker*, 369 U.S. at 217. The Experts contends that the first, second, and fourth of the six *Baker* factors are implicated in the Complaints — namely, textual constitutional commitment to a political branch, lack of manageable standards, and the potential lack of respect to a coordinate branch of government. It calls the Navy "the elephant in the room (but not in the caption)" and argues that given its "substantial and inescapable role" in these cases, the claims raise a political question. Experts MTD, Case No. 15-216 [Dkt. 121] at 1.[9] The Court disagrees.

        With respect to the first factor, The Experts argue that Plaintiffs' claims invoke issues that are constitutionally committed to the Navy and the Executive Branch. The Experts point out Navy's investigation of Mr. Alexis's background, the decision to grant him a Secret-level security clearance, the decision to honorably discharge him, and the decision not to report Mr. Alexis's arrests. None of this is relevant, let alone "*inextricable* from the case at bar." *Baker*, 369 U.S. at 217 (emphasis added). Plaintiffs do not challenge these actions. Navy's choices and actions are not at issue because The Experts was not required to hire or retain Mr. Alexis, or to assign him to work at the Navy Yard following the events of August 2013. In the event that civil liability is imposed, it would be based on what The Experts knew or should have known about Mr. Alexis prior to the shooting, regardless of what the Navy knew or should have reported.

---

[9] The Experts filed an omnibus motion to dismiss and an omnibus reply brief in all nine cases. For purposes of clarity, the Court will only use the docket numbers of the Delorenzo case when citing its briefs. Nonetheless, both documents may be found in each of the other cases.

Certainly, some of the Plaintiffs' theories of liability would implicate matters that are within the sole purview of the Executive, such as the issuance and revocation of a security clearance. *See* Delorenzo Compl., Case No. 15-216 [Dkt. 1] ¶¶ 280-82 (alleging that had The Experts made an adverse incident report under NISPOM, Mr. Alexis's security clearance may have been revoked, and his access to the Navy Yard denied). These theories are unnecessary to advance a negligence claim.

With respect to the second and fourth factors, Plaintiffs' claims do not require the Court to pass judgment on any of the Navy's actions. There is no need to speculate as to what the Navy should or could have done with respect to Mr. Alexis's security clearance or arrest record. Instead, the Court must analyze the allegations against The Experts under the analytical framework applicable to negligence claims. This is what courts applying D.C. law do on a daily basis and, thus, it cannot be said that the legal standards governing these tort claims are not judicially manageable. Finally, while the actions and judgments of the Navy are inevitably lurking background facts, they are not implicated in any of the claims against Defendants. There is no potential risk that the Court's analysis of the merits in these cases will disrespect the Navy or the Executive. Even if the Navy were to hold part of the blame for the damages sustained in these cases, it does not render the claims against The Experts non-justiciable on the basis of a political question. *See Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982) (stating that "one cannot escape liability for one's own negligence merely because another person . . . may have contributed to the injury by his wrongful or negligent act").

Accordingly, the Court holds that Plaintiffs' claims present a justiciable question and that it has jurisdiction to address the merits of these Complaints.

### B. Motions to Dismiss by HPES and The Experts

Plaintiffs allege tort claims against HPES and The Experts. The common thread across the nine complaints are the common law negligence claims (*i.e.*, negligent hiring, retention, supervision, undertaking, and credentialing) against both defendants for failure to anticipate and prevent the criminal acts of Mr. Alexis on September 16, 2013. The nine complaints are premised on the basic allegation that Mr. Alexis's behavior prior to September 16, 2013 raised serious concerns about possible violent tendencies that should have alerted HPES and The Experts. There are also various counts alleging claims of statutory duty in tort and/or negligence *per se* against both defendants, as well as three counts of assault and battery based on a theory of vicarious liability. HPES and The Experts argue that Plaintiffs' theories of liability are legally deficient and that the Complaints against them must be dismissed as a matter of law. The main point of contention revolves around the applicable legal standard for those claims rooted in D.C. negligence law.

#### 1. Theories of Negligence under D.C. Common Law

To state a claim on which relief can be granted, Plaintiffs must allege sufficient facts to make a plausible showing that: (1) HPES and The Experts owed a duty of care to the Plaintiffs; (2) HPES and The Experts breached this duty of care; and (3) the breach of that duty proximately caused each Plaintiff's injuries. *See District of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001). These three elements must be met to render HPES and The Experts liable on any negligence theory for damages arising from the Navy Yard shooting.

In the District of Columbia, there is a "general rule of nonliability at common law for harm resulting from the criminal acts of third parties." *Romero v. Nat'l Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 81 (D.C. Cir. 1984) (Scalia, J.) (citing *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477, 481 (D.C. Cir. 1970); *Hall v. Ford Enterprises Ltd.*, 445 A.2d

610, 611 (D.C. 1982)).  One "limited exception to [this] 'general rule of nonliability'" is the heightened foreseeability principle, by which a defendant may be liable for harm resulting from another's criminal act only if it were particularly foreseeable to the defendant that a third party would commit the crime.  *Workman v. United Methodist Comm. on Relief*, 320 F.3d 259, 263 (D.C. Cir. 2003) (quoting *Romero*, 749 F.2d at 81).  This heightened showing of foreseeability has been described as "'exacting,' 'demanding,' 'precise,' and 'restrictive.'"  *Sigmund v. Starwood Urban Inv.*, 475 F. Supp. 2d 36, 42 (D.D.C. 2007) (*Sigmund I*), aff'd sub nom. *Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512 (D.C. Cir. 2010) (*Sigmund II*) (citing *Novak v. Capital Mgm't. & Dev. Corp.*, 452 F.3d 902, 912 (D.C. Cir. 2006); *Bell v. Colonial Parking, Inc.*, 807 F. Supp. 796, 797 (D.D.C. 1992); *Potts v. District of Columbia*, 697 A.2d 1249, 1252 (D.C. 1997); *Lacy v. District of Columbia*, 424 A.2d 317, 323 (D.C. 1980)).

The D.C. Court of Appeals has considered "the requisite duty of care required for negligence" to be "a function of foreseeability, arising only when foreseeability is alleged commensurate with 'the extraordinary nature of [intervening] criminal conduct.'"  *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C. 2005) (quoting *Potts*, 697 A.2d at 1252); *see also Workman*, 320 F.3d at 265 (noting that "D.C. Courts have repeatedly spoken of the heightened foreseeability requirement in terms of duty") (citations omitted).[10]  In such

---

[10] The D.C. Circuit has noted that D.C. negligence law "might offend a doctrinaire" because foreseeability is considered usually in terms of the constituent elements of breach and causation, as opposed to whether a duty is owed.  *Workman*, 320 F.3d at 265 ("Ordinarily, the relationship between the parties is the key to determining whether the defendant had a legally enforceable duty to the plaintiff (or her decedent), whereas foreseeability is important to issues of proximate causation and conformity to the standard of care, issues that arise only after a duty has been found.") (citations omitted).  The D.C. Court of Appeals has acknowledged this criticism of D.C. negligence law, yet has continued to apply the analytical framework as is.  *See Beretta*, 872 A.2d at 641 n.4.  Accordingly, the Court "appl[ies] the law of the District of Columbia as its own courts would apply it" and does not "second-guess the analytical framework those courts have erected."  *Workman*, 320 F.3d at 265.

circumstances, "the plaintiff bears the burden of establishing that the criminal act was so foreseeable that a duty arises to guard against it." *Potts*, 697 A.2d at 1252.

In cases involving third-party criminal conduct, D.C. courts have "tended to leapfrog directly to the foreseeability issue" to resolve questions of liability. *Workman*, 320 F.3d at 265. This is precisely what the parties have done by focusing on the foreseeability of Mr. Alexis's criminal acts and arguing whether any of the Complaints alleges sufficient facts to show that HPES and The Experts owed a duty of care to Plaintiffs. HPES and The Experts argue that a heightened showing of foreseeability is required to render them liable because, absent such a showing, the Court cannot find there was a duty to guard against Mr. Alexis's criminal acts. Plaintiffs oppose.

### i. Duty and Foreseeability in Claims of Negligent Hiring, Retention, and Supervision

As HPES and The Experts contend, the heightened foreseeability requirement stems from the extraordinary nature of criminal conduct. *See McKethean v. WMATA*, 588 A.2d 708, 717 (D.C. 1991) ("Because of 'the extraordinary nature of criminal conduct, the law requires that the foreseeability of the risk be more precisely shown.'") (quoting *Lacy*, 424 A.2d at 323); *see also Romero*, 749 F.2d at 83 ("[C]ivil liability for the intervening, independent criminal acts of third parties is extraordinary, and District of Columbia courts, in their development of common-law tort rules, have imposed especially stringent requirements to support it.") (citation omitted). Criminal conduct is said to be "extraordinary" because "under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law." *Morgan v. District of Columbia*, 468 A.2d 1306, 1318 (D.C. 1983) (quoting Restatement (Second) of Torts § 302B cmt. d (1965)). However, contrary to what HPES and The Experts contend, the third-party criminal conduct does not end the inquiry.

In discussing intervening criminal acts and the applicable foreseeability standard, D.C. courts consider the negligence theory being advanced and the circumstances of each case. "The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it . . . [, which] is ultimately a question of fairness." *Romero*, 749 F.2d at 79 (internal quotation marks and citations omitted) (emphasis in original).

There are two lines of cases in which a lesser degree of specificity is required with respect to evidence of foreseeability: those involving either (1) "a special relationship between the parties to the suit" or (2) "a relationship of control between the defendant and the intervening criminal actor . . . ." *Romero*, 749 F.2d at 81 (internal citations omitted) (recognizing these two categories as "[t]he only District cases departing from that [general] rule" of nonliability at common law for intervening criminal acts); *see also Workman*, 320 F.3d at 263 ("From our review of the D.C. cases, we see that the requirement that the defendant have been able to foresee that a third party would likely commit a criminal act ordinarily has, and perhaps must have, a relational component."). In the absence of such relationships or when the circumstances of a particular case do not suggest a duty of protection or a duty to control, then "the evidentiary hurdle is higher" and the risk of the criminal act must be precisely shown. *Workman,* 320 F.3d at 264.[11]

---

[11] *Workman* opined that "the cases suggest a sliding scale: If the relationship between the parties strongly suggests a duty of protection, then specific evidence of foreseeability is less important, whereas if the relationship is not the type that entails a duty of protection, then the evidentiary hurdle is higher." *Workman,* 320 F.3d at 264 (holding that an international relief organization owed no duty to protect aid contractor from murder by third-party Somalis). The Circuit referenced only the relationship between the parties because that was the issue implicated in the case. Nonetheless, this Court finds that the sliding scale reasoning goes beyond the facts of *Workman* and extends to cases involving a relationship of control between the defendant and the intervening actor. *See Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 195 (D.D.C. 2007); *see also* Restatement (Second) of Torts § 315 ("There is no duty . . . to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.").

The rationale for lessening the requirement of heightened foreseeability in cases involving a special relationship between the parties is that "the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other," and, therefore, "a duty should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated." *Kline*, 439 F.2d at 483.[12] This category is inapplicable here since Plaintiffs did not submit in any way to the control of HPES or The Experts and there is no special relationship (contractual, at common law, or otherwise) between them.

The focus of Plaintiffs' briefs revolves around the second category of cases: those involving a special relationship of control between defendants (HPES and The Experts) and the intervening criminal actor (Mr. Alexis). The heightened requirement of foreseeability is lessened in this category of cases because the defendant knows the actor, has the ability to control or supervise him, and can prevent his misconduct so long as the necessity and opportunity to do so arises. *See, e.g.*, Restatement (Second) of Torts § 316 (recognizing duty of parent to control conduct of child); *id.* § 317 (recognizing duty of master to control conduct of servant); *id.* § 318 (recognizing duty of possessor of land or chattels to control conduct of

---

[12] The D.C. Court of Appeals has recognized "the relationships of landowner to invitee, businessman to patron, employer to employee, school district to pupil, hospital to patient, []common carrier to passenger [, and landlord to tenant]" as examples of special relationships that "give rise to a *duty of one party to protect the other party* from foreseeable criminal acts of third persons . . . ." *Hall*, 445 A.2d at 611 n.4 (citations omitted) (emphasis added); *see also Workman*, 320 F.3d at 264. In such cases, "the heightened foreseeability is lessened somewhat, and 'can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act.'" *Sigmund I*, 475 F. Supp. 2d at 42 (citing *Novak*, 452 F.3d at 912; *Doe v. Dominion Bank*, 963 F.2d 1552, 1561 (D.C. Cir. 1992); *District of Columbia v. Doe*, 524 A.2d 30, 33 (D.C. 1987)).

licensee); *id.* § 319 (recognizing duty of those in charge of person having dangerous propensities).

Under those circumstances, a duty to exercise reasonable care "should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions" to prevent the person under its control from intentionally harming others or from conducting himself as to create an unreasonable risk of bodily harm to others. *Kline*, 439 F.2d at 483 (noting "there is no liability normally imposed upon the one having the power to act if the violence is sudden and unexpected *provided that the source of the violence is not an employee of the one in control*") (emphasis added); *see also Phelan v. City of Mount Rainier*, 805 A.2d 930, 941 (D.C. 2002) ("Generally, one has no duty to prevent the criminal acts of a third party *who is not under the defendant's supervision or control* unless the criminal conduct was the foreseeable result of the person's negligence.") (internal quotation marks and citation omitted) (emphasis added).

Naturally, the one possessing control is not an insurer of public safety. A duty of care is owed only to those persons foreseeably exposed to the risk of harm resulting from the actor's misconduct — specifically, those brought into contact with a third person subject to the defendant's control or supervision whom the defendant "knows or should know to be peculiarly likely to commit intentional or reckless misconduct." Restatement (First) of Torts § 302, cmt. n (1930); *see also Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951). Under these circumstances, a defendant "is required to anticipate and provide against all of these misconducts" regardless of whether the "third person's misconduct is or is not criminal at common law or under a statute." Restatement (First) of Torts § 302, cmt. n. Moreover, a defendant "is subject to liability only for such harm as is within the risk . . . caused by the quality of the employee which the employer had reason to suppose would be likely to cause harm." Restatement (Second) of Agency § 213

(1958); *see also Argonne House Co. v. Garrison*, 42 F.2d 605 (D.C. Cir. 1930) (holding that employer's knowledge of employee's criminal conviction for intoxication did not put employer on notice that employee might be a thief).

To prevail on a theory of negligent hiring, retention, or supervision, "it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (citing *Murphy v. Army Distaff Found., Inc.*, 458 A.2d 61, 64 (D.C. 1983)). This standard may apply to intentional conduct outside the scope of employment, even when the conduct is criminal in nature. *See Int'l Distrib. Corp. v. Am. Dist. Tel. Co.*, 569 F.2d 136, 139 (D.C. Cir. 1977) (stating that "an employer has a duty to supervise those of its employees who are privileged because of their employment to enter another's property" and noting that "[t]his duty even extends to activities which, like theft, are outside the scope of employment") (citing Restatement (Second) of Torts § 317 and accompanying comments). With respect to how the interplay between duty and foreseeability works in practice in the context of negligent hiring, retention, or supervision claims, the Court is left to reason by analogy from applicable D.C. cases.

In *Murphy v. Army Distaff Foundation, Inc.*, the D.C. Court of Appeals reversed the entry of summary judgment in favor of a retirement home for wives of deceased army officers after the home's gardener shot a trespasser six times. 458 A.2d at 62. The trespasser sued the retirement home for his injuries under a theory of negligent supervision. *See id.* at 62 n.1, 63. The D.C. Court of Appeals noted that, to prevail under this theory of liability, the plaintiff needed to establish that the retirement home "knew or should have known that its

employee regularly ejected trespassers while armed, and that the employer failed to take reasonable precautionary measures in supervising him." *Id.* at 63. Other than evidence of prior altercations between the gardener and trespassing youth, there was no evidence that the employer knew or should have known that the gardener "'carried a gun or had a propensity to use one.'" *Id.* at 64. Nonetheless, the D.C. Court of Appeals reversed the trial court's entry of summary judgment and remanded the case for trial on the basis that "'[o]ne who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others.'" *Id.* (quoting Restatement (Second) of Agency § 213, cmt. g)

      *Murphy* is not a paradigm of clarity or precision.[13] What is clear is that *Murphy* ultimately did not require specific evidence of foreseeability when it reversed the trial court's entry of summary judgment. *Murphy* demonstrates that awareness of an employee's dangerous behavior or attributes could be sufficient to establish foreseeability under a theory of negligent supervision if that attribute proximately caused the injury sustained by the plaintiff — an outcome clearly inconsistent with the requirement of specific foreseeability evidence. *Compare* Restatement (Second) of Agency § 213 and Restatement (Third) of Agency § 7.05(1) (2006) *with Sigmund I*, 475 F. Supp. 2d at 42 (noting that a heightened showing of foreseeability "requires proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location") (citing *Romero*, 749 F.2d at 79-80; *Lacy*, 424 A.2d at 323) and *McKethean*, 588 A.2d at 717 (explaining "that a specific crime, 'rather than merely harm in general,' [must be] foreseeable") (citing *Romero*, 749 F.2d at 79-80).

---

[13] It is not clear why the D.C. Court of Appeals first stated that specific proof that the gardener regularly ejected trespassers while armed was necessary, but then found that evidence of prior altercations could be sufficient by itself to find the employer liable.

The D.C. Court of Appeals has confirmed this reading of *Murphy* in subsequent cases involving criminal misconduct and allegations of negligent hiring, supervision, and retention. Specifically, in *Giles v. Shell Oil Corp.*, a case involving a suit against Shell for damages arising from an incident in which a service station attendant fatally shot a boy, the D.C. Court of Appeals relied on *Murphy* to articulate the foreseeability standard applicable to claims of negligent hiring, retention, and supervision — namely, whether "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner . . . ." *Giles*, 487 A.2d at 613 (citing *Murphy*, 458 A.2d at 64). [14]

In *Brown v. Argenbright Security, Inc.*, the D.C. Court of Appeals held that a store owner (Safeway Stores, Inc.) was not liable for negligent supervision of a security guard employed by a contractor (Argenbright Security, Inc.) who stopped a minor "on suspicion of shoplifting . . . and, in the course of searching her, touched her in a sexually improper manner." 782 A.2d 752, 755 (D.C. 2001). [15] Applying the standard articulated in *Giles* and citing *Murphy*, the court concluded that "no facts would warrant an inference of negligent supervision against

---

[14] The D.C. Court of Appeals affirmed the entry of summary judgment in favor of Shell because "[t]he attendant who fired the fatal shot was not an employee of Shell" and, thus, there was no "master-servant relationship." *Giles*, 487 A.2d at 613.

[15] *Brown* clarified that "[a]lthough *Giles* and other cases discuss negligent supervision in the context of an employer-employee relationship and frequently use the term 'employee,' it is clear from the Restatement [(Second) of Agency] and other authorities that a claim of negligent supervision does not require proof that the supervised person was also an employee or agent." *Brown*, 782 A.2d at 760 n.11. The Restatement provides in relevant part that the supervised person need not be an employee or agent to establish liability under a theory of negligent supervision if the defendant was "negligent or reckless . . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, . . . upon premises or with instrumentalities under [the defendant's] control." Restatement (Second) of Agency § 213(d).

Safeway." *Id.* at 760 (internal quotation marks omitted).[16]  The only evidence linking the security guard to Safeway was "that a Safeway employee may have been present at the time of the alleged assault," which the court described as insufficient since the employee did not have supervisory authority over the security guard and did not have "the power to control [the guard's] conduct or the opportunity to alert someone who did have that power in time to prevent the harm." *Id.*  The court affirmed the entry of summary judgment in favor of Safeway.

Moreover, in *Phelan v. City of Mount Rainier*, a widow sued the City of Mount Rainier, in Maryland, and its chief of police for negligent hiring, supervision, training, and retention, after her husband was shot and killed by an off-duty Maryland police officer in Washington, D.C. 805 A.2d 930, 932-33 (D.C. 2002).  The plaintiff alleged that the police officer shot her husband "eleven times without provocation."  *Id.* at 934 n.4.  At summary judgment, after the plaintiff withdrew her claims of negligent hiring and training, the trial court granted summary judgment for the city and police chief on the remaining claims.  On appeal, the D.C. Court of Appeals applied the standard of *Giles* to the claims of negligent retention and supervision and cited *Murphy* and *Fleming v. Bronfin*[17] for the proposition that an employer may be found liable for the acts of its employees or agents even if the harm resulted from a willful act

---

[16] Interestingly, the D.C. Court of Appeals cited *Boykin*, a case applying heightened foreseeability, when addressing plaintiff's *respondeat superior* claims, yet did not cite *Boykin* or require specific foreseeability evidence when addressing plaintiff's negligent supervision claim. *Compare Brown*, 782 A.2d at 757-58 & n.7 (citing *Boykin*, 484 A.2d at 562) *with id.* at 759-60 (citing *Giles*, 487 A.2d at 613; *Murphy*, 458 A.2d at 63).

[17] In *Fleming*, the plaintiff sued a grocery store operator for negligent hiring and supervision of a store deliveryman who sexually assaulted her after delivering groceries and receiving payment. 80 A.2d at 916.  The D.C. Court of Appeals held that an employer has a duty to exercise reasonable care in hiring employees and not retain an unfit employee tasked with entering the homes of customers. *Id.* at 916-17 ("When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment.").

outside the scope of employment.  *See id.* at 937 (citing *Giles*, 487 A.2d at 613; *Murphy*, 458 A.2d at 63; *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951)) (other citation omitted).

However, the *Phelan* court affirmed summary judgment because there were no facts or circumstances to show that defendants knew or should have known that the officer behaved in a dangerous or incompetent manner that rendered the shooting foreseeable. The court noted that, unlike *Murphy* and *Fleming*, the intervening criminal act in *Phelan* did not occur at the place of employment and was not associated in any way with his job.  *See id.* at 938-40. Simply put, despite arguable awareness of some dangerous attributes and "substantial evidence that [he] had many disciplinary problems as a police officer prior to the shooting," *id.* at 942, the victim was not within the group of foreseeable persons exposed to a risk of harm because defendants did not bring the officer into contact with the victim. The evidence was "insufficient to establish a duty on the part of the City running to [plaintiff's] decedent or a causal nexus between the failure to discipline and [the police officer's] non-duty related confrontation and shooting of the decedent in a jurisdiction where he was an ordinary citizen." *Id.* at 940 (citing *District of Columbia v. Coleman*, 667 A.2d 811, 816-17 (D.C. 1995)). [18]

---

[18] A similar result was reached in *Rawlings v. District of Columbia*, where the parents of a fourteen-year-old boy sued the District of Columbia alleging, in part, that the Metropolitan Police Department (MPD) was negligent in training and supervising a police officer who shot and killed their allegedly unarmed child in an off-duty confrontation.  820 F. Supp. 2d 92, 98-102 (D.D.C. 2011).  Applying the standard articulated in *Giles*, the court found that defendants did not bring the police officer into contact with the victim, and also, the fact that the police officer was involved in two previous off-duty shootings was not probative of dangerous or incompetent behavior because the prior shootings were justified and in compliance with MPD policy.  *See id.* at 115.  It concluded that plaintiff had "failed to show that any duty of care was breached by the District of Columbia . . . , much less a causal relationship between any supposed breach and [the boy's] death." *Id.* at 116 (citing *Phelan*, 805 A.2d at 940).

Finally,  in *Schechter v. Merchants Home Delivery, Inc.*, a customer of an appliance store sued the store and a delivery company for negligent hiring, training, and supervision after a deliveryman committed theft in the customer's home.  892 A.2d 415 (D.C. 2006).  The D.C. Court of Appeals found that evidence that the deliveryman at one time had entered a guilty plea to fourth degree of burglary with the intention to commit theft from a dwelling, constituted sufficient evidence to find that the companies owed a duty of care to the plaintiff by bringing him into contact with an employee whom the defendants knew or should have known was likely to commit intentional or reckless misconduct.  *See id.* at 431-32 (citing *Murphy*, 458 A.2d at 64; *Fleming*, 80 A.2d at 917;  Restatement (Second) of Agency § 213 & cmt. g).  The court remanded the case for trial.

HPES and The Experts fail to properly address the standard articulated in *Giles* or acknowledge the line of post-*Murphy* cases applying this standard.  They rely entirely on cases requiring specific evidence of foreseeability,  none of which analyzed claims of negligent hiring, retention, or supervision.  "[I]n stark contrast to nearly all of the cases cited . . . and relied upon by the defendant[s]," the allegations in this case support the plausible existence of "'a special relationship of control between the defendant[s] and the intervening criminal actor,' *Romero*, 749 F.2d at 81, giving rise to a duty of care and a commensurately less burdensome requirement that the plaintiff demonstrate 'specific evidence of foreseeability,' *Novak*, 452 F.3d at 912 (internal quotation marks and citation omitted)." *Smith*, 481 F. Supp. 2d at 195 (alteration omitted). HPES and The Experts cite only three cases, all of which are inapposite and easily distinguishable.

*Lacy v. District of Columbia* is one of the talismanic cases in D.C. tort law concerning the requirement of heightened foreseeability.  408 A.2d 985 (D.C. 1979) (*Lacy I*), *on*

*reh'g*, 424 A.2d 317 (D.C. 1980) (*Lacy II*).  In *Lacy*, a mother and daughter sued a school janitor, principal, teacher, guidance counselor, and the District of Columbia to recover for injuries sustained after the school janitor sexually assaulted the daughter.  The case went to trial and, at the conclusion of the plaintiff's case, the trial judge ordered a directed verdict in favor of the District of Columbia on the theory of negligent hiring, training, and supervision of the janitor. *See Lacy I*, 408 A.2d at 990.  The jury returned a verdict against the janitor on a theory of assault and battery and against the school principal, teacher, counselor, and the District of Columbia on a theory that they were negligent in their care of the child (*i.e.*, ordinary negligence).  The trial judge set aside the jury verdict because it was "excessive" and "unreasonable" and ordered a new trial. *Id.* at 987.

On retrial, a new trial judge did not allow the mother and daughter to "present *again* to the jury the *very same evidence* they had presented at the first trial to prove the District negligent in its hiring, training, and supervising of the janitor" because this theory was directed out of the case. *Id.* at 990 (emphasis in original).  The trial judge entered judgment against the janitor and in favor of the other defendants on the remaining negligence claim.  The mother and daughter appealed, among other things, the order granting the new trial and the ruling that evidence on the claims of negligent hiring, training, and supervision could not be presented to the jury on retrial.  They did not "assert [that the first trial judge's] ruling on the sufficiency of the evidence they presented was error." *Id.* at 990 n.4.  The D.C. Court of Appeals affirmed both rulings, but reversed the second trial judge on a separate issue involving a jury instruction on foreseeability and proximate cause.  On a petition for rehearing, the D.C. Court of Appeals readopted its "previous opinion in all respects except for the finding of prejudicial error" concerning the jury instruction and affirmed the entry of judgment in favor of the District of

Columbia and the school officials (other than the janitor). *Lacy II*, 424 A.2d at 318.  HPES and

The Experts rely on *Lacy II* for the proposition that a requirement of heightened foreseeability

applies to Plaintiffs' claims of negligent hiring, retention, and supervision.  However, it is clear

that *Lacy II* did not involve such claims.

The second case relied upon by HPES and The Experts is *Boykin v. District of*

*Columbia*, 484 A.2d 560 (D.C. 1984).  In that case, a blind, deaf, and mute student sued the

coordinator of a program for blind and deaf students and the District of Columbia to recover for

injuries sustained after the coordinator sexually assaulted her.  *See id.* at 561.  The student

alleged that the District was negligent in hiring and supervising the coordinator.  *See id.*

However, she presented no evidence to support her claims and so the trial judge granted the

District's motion for summary judgment.  On appeal, the D.C. Court of Appeals noted that "the

trial court was entitled to assume that [the student] admitted there was no evidence the District

knew or should have known that [the coordinator] posed a danger to students greater than that

posed by any other teacher."  *Id.* (citing Super. C. Civ. R. 12-1(k)). [19]  The student did not assert

"that she had shown in the trial court that there was reason to think that [the coordinator] might

have been dangerous."  *Id.* at 564-65.  In essence, the court held that there was no evidence of an

awareness that the coordinator behaved in a dangerous manner that created a risk of harm to the

student, which comports with the applicable standard in negligent hiring and supervision cases.

The student's only theory against the District was that "it was negligent . . . to have permitted

---

[19] In 1984, Superior Court Rule of Civil Procedure 12-1(k) required a non-moving party to file a statement of genuine issues of material fact in support of its opposition to a motion for summary judgment.  *See* Anthony R. Pileggi, *An Attorney's Guide to Courthouse Practice and Procedure: Civil Division District of Columbia Superior Court 1983*, 32 Cath. U. L. Rev. 1063, 1113 (1983).  By citing Rule 12-1(k), the court made clear that the District was entitled to judgment as a matter of law because plaintiff failed to support her claims of negligent hiring, training, or supervision, or show there was a genuine issue of material fact warranting trial.

such one-on-one contacts" between teachers and students. *Id.* at 565. Her allegation was not specific to the hiring and supervision of the offending coordinator, but resembled the general negligence claim in *Lacy*. *Boykin* supports the proposition that claims of negligent hiring, retention, and supervision are treated differently.

The last case relied upon by HPES and The Experts is this Court's decision in *Jones v. R.I. Associates, LLC*, No. 02-1820 (RMC), 2005 WL 1475367 (D.D.C. June 22, 2005). In *Jones*, an officer of the D.C. Metropolitan Police Department pulled over a woman for speeding and then drove her to the hotel where he worked off-duty as a security guard and raped her in an unused conference room. The victim sued the hotel owner. *See id.* at *1. This Court entered summary judgment in favor of the hotel owner because the plaintiff could not prove heightened foreseeability. *See id. Jones* did not involve claims of negligent hiring, retention, or supervision. Instead, the victim sued the hotel owner on a theory of "premises liability, which is a '[a] landowner's or landholder's tort liability for conditions or activities on the premises.'" *Id.* at *3 (citing Black's Law Dictionary (8th ed. 2004)); *see also id.* at *4 (noting plaintiff "argue[d] that the owner of the Hotel is liable to her because of its alleged negligence due to its failure to prevent its premises from being used for the commission of a crime committed against [her] . . . .").

Thus, *Lacy*, *Boykin*, and *Jones* are inapplicable to Plaintiffs' allegations because none of those cases involved claims of negligent hiring, retention, and supervision. At the risk of repetition and in the interest of clarity, D.C. case law indicates that an employer owes a duty of care to those brought into contact with a third person subject to the defendant's control or supervision when the defendant knew or should have known that the third person was likely to commit intentional or reckless misconduct. *See Giles*, 487 A.2d at 613 ("[I]t is incumbent upon

a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge failed to adequately supervise the employee."). In addition, the ensuing harm must be foreseeable in light of the quality or conduct of the employee "which the employer had reason to suppose would be likely to cause harm." Restatement (Second) of Agency § 213; *see also Argonne House*, 42 F.2d 605.

Having resolved this major point of contention regarding the applicable standard to Plaintiffs' claims of negligent hiring, retention, and supervision, the Court will examine Plaintiffs' allegations.

### ii.    Plaintiffs' Claims of Negligent Hiring

#### *Claim #1: HPES and The Experts negligently hired Mr. Alexis*

All Plaintiffs allege that HPES and The Experts were negligent in hiring Mr. Alexis as a computer technician assigned to work under the Navy-Marine Corps Intranet Continuity of Service Contract. It is well established that "[a]n employer cannot be liable for negligent hiring if the employer conducts a reasonable investigation into the person's background or if such an investigation would not have revealed any reason not to hire that person." *Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 230 (D.D.C. 2015) (quoting *Doe v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16, 28-29 (D.D.C. 2008)). Consequently, "to state a claim for negligent hiring, a plaintiff must allege specific facts from which an inference can be drawn that the employer did not conduct a reasonable background investigation, and that such an investigation would have uncovered a reason not to hire the alleged tortfeasor." *Id.* Plaintiffs do neither.

Plaintiffs allege that HPES and The Experts knew or should have known of a proclivity towards violence and a history of dangerous behavior by Mr. Alexis prior to September 2012 (*i.e.*, when he was first hired by The Experts). However, the Complaints do not allege facts to support such a claim. The only relevant allegations are conclusory and insufficient to satisfy *Twombly*. Plaintiffs allege that Mr. Alexis had a history of arrests (without convictions) while he was in the Navy — specifically between June 2004 and September 2010 — where he allegedly exhibited a proclivity towards violence.

The Complaints directly contradict the conclusory statement that HPES and The Experts *knew* about Mr. Alexis's violent history. Plaintiffs allege throughout their pleadings that the criminal convictions checks, motor vehicle driving record check, and the drug screening test, required by HPES and conducted by The Experts on two separate occasions, in September 2012 and July 2013, failed to reveal Mr. Alexis's arrest record or related violent conduct. *See, e.g.*, Delorenzo Compl. ¶ 13; Proctor Compl. ¶¶ 24, 26; Kohler Compl. ¶ 32; Ridgell Compl. ¶ 30; Zagami Compl. ¶ 32; Jacobs Compl. ¶ 42. Similarly, the Navy Report relied upon by Plaintiffs and cited, in many instances *verbatim*, in their Complaints, reinforces the allegations that Mr. Alexis was subject to "pre-employment suitability checks . . . which involved a drug test, a motor vehicle driving record check, and criminal convictions checks." HPES MTD, Case No. 15-216, Ex. A. [Dkt. 120-2] (JAGMAN Report) at 31-32.[20] As Plaintiffs allege, Mr. Alexis had no convictions and was never prosecuted. The two "pre-employment suitability checks" required by HPES would never have revealed arrests or Mr. Alexis's supposed violent background. The

---

[20] As did The Experts, HPES filed an omnibus motion to dismiss and an omnibus reply brief in all nine cases. For purposes of clarity, the Court will only use the docket numbers of the Delorenzo case when citing its briefs. Nonetheless, both documents may be found in each of the other cases.

Complaints internally contradict any allegations that might have supported an inference of actual knowledge. The Court cannot "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal citation and quotation marks omitted).

Plaintiffs' assertion that HPES and The Experts *should have known* about Mr. Alexis's prior arrests and supposed proclivity towards violence is even more conclusory and without factual support. Plaintiffs baldly allege that the pre-employment checks were "insufficient" because they "failed to uncover [Mr. Alexis's] prior arrest record . . . ." Proctor Compl. ¶ 27; *see also* Kohler Compl. ¶ 32; Ridgell Compl. ¶ 30; Zagami Compl. ¶ 32; Jacobs Compl. ¶ 42 (alleging that HPES and The Experts should have known because "arrests in [Mr. Alexis's] background . . . were a matter of public record"). However, Plaintiffs do not, and cannot, allege that HPES and The Experts were legally required (by federal or local statute, contract, or otherwise) to conduct criminal *arrest* checks for the position of computer technician. In fact, such a requirement would likely suffer from significant constitutional infirmities and violate D.C. law. *See infra* at 38 & n.21.

"[C]harges resulting in acquittal clearly have no legitimate significance" and "a collection of dismissed, abandoned, or withdrawn arrest records are no more than gutter rumors when measured against any standards of constitutional fairness to an individual . . . ." *Utz v. Cullinane*, 520 F.2d 467, 479 (D.C. Cir. 1975) (quoting *United States v. Dooley*, 364 F. Supp. 75, 77 (E.D. Pa. 1973)). The "dissemination of arrest records in a situation in which it is known they will be utilized for employment and licensing purposes" would impose "considerable barriers," *id.* at 479-80, and likely undermine an individual's due process rights, the sacrosanct

presumption of innocence, as well as impair the constitutional right of privacy, *see id.* at 482 n. 41.

Moreover, "information concerning a prospective employee's record of arrests without convictions, *is irrelevant to his suitability or qualification for employment.*" *Id.* at 482 (quoting *Gregory v. Litton Systems, Inc.*, 316 F. Supp. 401, 403 (C.D. Cal. 1970), *modified on other grounds and aff'd as modified*, 472 F.2d 631 (9th Cir. 1972)) (emphasis added). In addition, at the time of Mr. Alexis's hiring, the Duncan Ordinance regulated the dissemination of arrest records in the District of Columbia and prohibited access to any pre-conviction or post-exoneration arrest information for employment purposes. The Ordinance provided in relevant part "that it shall be an offense punishable by a fine not to exceed $50.00, for any person to require as a condition of employment the production of any arrest record or copy, extract or statement thereof at the expense of any employee or applicant for employment to whom such record may relate." *Id.* at 485-86 (noting that "[a]lthough Duncan Ordinance [was] not officially reported, it [was] reproduced as an Appendix to" *Morrow v. District of Columbia*, 417 F.2d 728, 745-46 n.9 (D.C. Cir. 1969)).[21]

In conclusion, any inference that HPES and The Experts knew or should have known of Mr. Alexis's arrest record and dangerous behavior prior to 2012 is unsupported and

---

[21] The Duncan Ordinance was adopted by the D.C. Board of Commissioners on October 31, 1967. The Ordinance was subsequently amended by the Re-Entry Facilitation Amendment Act of 2012, effective June 15, 2013 (D.C. Law 19-319; 60 D.C. Reg. 2333 (March 1, 2013)) and the Post-Arrest Process Clarification Amendment Act of 2014, effective April 24, 2015 (D.C. Law 20-243; 61 D.C. Reg. 8320 (August 15, 2014)). In addition, in 2014, the D.C. Legislature enacted the Fair Criminal Record Screening Act of 2014, effective December 17, 2014 (D.C. Law 20-152; 61 D.C. Reg. 8904 (August 21, 2014)) reiterating that "an employer may not make an inquiry about or require an application to disclose or reveal an arrest or a criminal accusation made against the applicant, which is not pending against the applicant or did not result in a conviction." D.C. Code § 32-1342 (a) (alterations omitted).

contradicted by Plaintiffs' own allegations. *See Arpaio*, 797 F.3d at 19. According to the

Complaints and the Navy Report, The Experts hired Mr. Alexis knowing that he: (1) had no

criminal convictions and that he passed the drug test and the motor vehicle driving record check

required by HPES; (2) was honorably discharged from the Navy in January 2011; and (3) had an

active Secret-level security clearance with a favorable re-enlistment code. No jury could find

from these facts that HPES or The Experts failed to exercise reasonable care in hiring Mr.

Alexis. *See Boykin*, 484 A.2d at 564; *cf. Schechter*, 892 A.2d at 431-32; *Fleming*, 80 A.2d at

916-17.

   The assertion that HPES and The Experts "had actual and/or constructive

knowledge of [Mr.] Alexis's propensity for gun violence" has no factual support. Halmon-

Daniels Compl., Case No. 15-1501 [Dkt. 1] ¶ 95. Plaintiffs contend that they should be allowed

discovery to learn precisely what HPES and The Experts knew about Mr. Alexis at the time of

his hiring. They seem to argue it is "unreasonable to expect the Complaint to offer a more

detailed factual foundation for Plaintiff[s'] negligent-hiring claim." *Search*, 128 F. Supp. 3d at

230. To the contrary, the Court adopts the analysis of another member of this Court in similar

circumstances:

> This apparent Catch-22 is the reason that "detailed factual
> allegations are not necessary to withstand a Rule 12(b)(6) motion,"
> but it does not excuse a Plaintiff's failure to "put forth factual
> content that allows the court to draw the reasonable inference that
> the defendant is liable for the misconduct alleged." *Kenley v.
> District of Columbia*, 83 F. Supp. 3d 20 (D.D.C. 2015) (internal
> quotation marks and citations omitted). Were that not the case, a
> plaintiff might merely invoke the magic words — *e.g.*, "negligent
> hiring," "constructive knowledge," and the like — and thereby
> subject a defendant to costly and potentially meritless litigation.

*Id*. at 230-31. Plaintiffs' allegations that HPES and The Experts knew, or should have known,

are conclusory and insufficient to satisfy *Twombly*'s pleading threshold. *See Willett v. United*

39

*States*, 24 F. Supp. 3d 1167, 1180 (M.D. Ala. 2014); *see also Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 128 (D.D.C. 2012) (dismissing claims of "negligent hiring, supervision, and retention" because "bare, conclusory assertions, in the form of unenlightening legal-speak, that Sodexo 'knew or should have known' are insufficient to survive Sodexo's Motion to Dismiss"). Accordingly, Plaintiffs' claims that HPES and The Experts were negligent in hiring Mr. Alexis will be dismissed.

### Claim #2: HPES negligently hired The Experts

Plaintiffs Kohler, Ridgell, Zagami, and Jacobs assert in their Complaints that HPES negligently hired The Experts and proximately caused their injuries. *See* Kohler Compl. ¶¶ 89-91; Ridgell Compl. ¶¶ 87-89; Zagami Compl. ¶¶ 89-91; Jacobs Compl. ¶¶ 99-101.  At oral argument, counsel for HPES conceded that it did not address this claim in its motion to dismiss. *See* 8/16/2016 Hr'g Tr. at 13:24-14:8  ("Well, Your Honor, I didn't read the complaints as making an argument that HP was responsible for anything that The Experts did or didn't do and sort of a vicarious liability theory.")[22]  Although Plaintiffs Kohler, Ridgell, Zagami, and Jacobs clearly assert this claim in their Complaints and HPES did not move to dismiss it, the claims are devoid of factual allegations that could support an inference that HPES negligently hired The Experts.

Plaintiffs needed to "allege specific facts from which an inference can be drawn that [HPES] did not conduct a reasonable background investigation [of The Experts], and that such an investigation would have uncovered a reason not to hire [The Experts]."  *Search*, 128 F. Supp. 3d at 230.  However, there are no allegations concerning the investigation and hiring of

---

[22] HPES may have misunderstood the nature of this claim.  Plaintiffs Kohler, Ridgell, Zagami, and Jacobs assert a direct-liability theory of negligent hiring of a subcontractor, as opposed to a claim of negligence based on the vicarious liability doctrine of *respondeat superior*.

The Experts or any history of incompetent behavior by The Experts, let alone any indication that The Experts was selected notwithstanding an actual or constructive awareness of its lack of skill, experience, or equipment. *See* Restatement (Second) of Torts § 411 & cmt. a and b. To the contrary, the Complaints focus on Mr. Alexis's relationship with The Experts, which is irrelevant to the assertion that HPES acted negligently when it entered into a contract with The Experts to provide services under the Navy-Marine Corps Intranet Continuity of Service Contract. Accordingly, these allegations will also be dismissed. *See Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990) ("Because it is patently obvious that [plaintiff] could not have prevailed on the facts alleged in his complaint, we find that *sua sponte* dismissal was appropriate.")

### iii.    Plaintiffs' Claims of Negligent Retention and Supervision

*Claim #1: HPES and The Experts negligently retained and supervised Mr. Alexis*

To state a claim for negligent retention and supervision, Plaintiffs must allege sufficient facts to advance a plausible inference that HPES and The Experts "knew or should have known" that Mr. Alexis "behaved in a dangerous or otherwise incompetent manner" prior to the Navy Yard shooting, and that HPES and The Experts, "armed with that actual or constructive knowledge failed to adequately supervise" Mr. Alexis. *Giles*, 487 A.2d at 613 (citing *Murphy*, 458 A.2d at 64). According to this theory of negligence and the allegations in the Complaints, HPES and The Experts had a duty to exercise reasonable care to control Mr. Alexis "while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them" because: (1) Mr. Alexis was brought into contact with the victims of the shooting through his employment (in other words, he was "privileged to enter" the premises due to his status as a

computer technician assigned to work at the Navy Yard); and (2) HPES and The Experts had the "ability to control" Mr. Alexis which, given Mr. Alexis's prior behavior, they knew or should have known "of the necessity and opportunity for exercising such control." Restatement (Second) of Torts § 317 and Restatement (First) of Agency § 302, cmt. n; *see also, e.g.*, *Int'l Distrib. Corp.*, 569 F.2d at 139; *Schechter*, 892 A.2d 415; *Phelan*, 805 A.2d at 938-40; *Fleming*, 80 A.2d at 917.

HPES and The Experts do not contest the sufficiency of Plaintiffs' allegations with respect to Mr. Alexis's authorization to enter the Navy Yard due to his employment or their ability to control and supervise Mr. Alexis. They also do not contest Plaintiffs' allegations concerning the inadequacy of their actions in failing to prevent the shooting. Rather, HPES and The Experts focus on the sufficiency of the allegations concerning what HPES and The Experts knew or should have known about Mr. Alexis prior to the shooting. The relevant question at a motion to dismiss is whether the actual or constructive knowledge of HPES and The Experts is sufficiently supported to make plausible a duty to exercise reasonable care in retaining and supervising Mr. Alexis.

Plaintiffs' allegations on this issue could be divided into two categories: (1) Mr. Alexis's arrest record and supposed violent behavior while he was in the Navy (June 2004- September 2010); and (2) Mr. Alexis's alleged violent behavior while he was a subcontractor (September 2012-September 2013). With respect to the first category, the Court has already found that the Complaints did not provide any actual basis to infer that HPES and The Experts knew or should have known of Mr. Alexis's prior arrest record and supposed proclivity towards violence at the time of his hiring. *See supra* at 36-40. Similarly, the Complaints do not provide any factual basis to infer actual or constructive knowledge of Mr. Alexis's arrest record or

alleged pre-employment history of violence acquired by HPES or The Experts after his hiring in September 2012.[23]

      At oral argument, counsel for Mr. Proctor suggested that because "[t]here was an [alleged] August 9th, 2013 discussion with Mr. Alexis's mother," in which she said that Mr. Alexis "had prior incidents of being paranoid," HPES and The Experts knew or should have known of Mr. Alexis's arrest record and proclivity towards violence. 8/16/2016 Hr'g Tr. at 50:12-17; *see also* Proctor Compl. ¶ 62 ("On August 9, 2013, The Experts HR director called [Mr.] Alexis's mother who said that [Mr.] Alexis had been paranoid and this was not the first episode he had experienced."); Kohler Compl. ¶ 52; Ridgell Compl. ¶ 50; Zagami Compl. ¶ 52; Jacobs Compl. ¶ 63.[24] The allegation falls short. It supports the limited inference that The Experts became aware in August 2013 that Mr. Alexis suffered from a mental illness. The vague allegation that Mr. Alexis "had been paranoid" in the past fails to support an inference of actual or constructive awareness of Mr. Alexis's arrest record and supposed violent attributes. Simply put, any attempt to equate mental illness with violence must fail. *See White v. Mansfield-Richland*, No. 12-CA-115 and 12-CA-116, 2013 WL 3936036, at *1, 8 (Ohio Ct. App. July 18,

---

[23] The Court notes that some Plaintiffs use the term "criminal history" to refer to Mr. Alexis's arrest record and pre-2012 actions although he was not prosecuted for any offense, let alone convicted of a crime. "There is no rational basis to presume guilt and active criminality from the mere fact of an arrest" and "[f]ew things are as fundamental to our legal system as the presumption of innocence until overcome by proof of guilt beyond a reasonable doubt at a fair trial." *Davis v. Paul*, 505 F.2d 1180, 1184 (6th Cir. 1974), *rev'd on other grounds*, 424 U.S. 693 (1976); *see also Menard v. Mitchell*, 328 F. Supp. 718, 724 (D.D.C. 1971) ("Under our system of criminal justice, only a conviction carries legal significance as to a person's involvement in criminal behavior.").

[24] There are no allegations that HPES was or should have been aware of this conversation between Mr. Alexis's mother and the HR Director for The Experts.

2013) (stating that while defendant "may have been aware of his son's mental illness, . . . suffering from a mental illness does not automatically equate violent behavior.").[25]

Perhaps aware of the frailty of their pre-2012 allegations, Plaintiffs shifted their focus at oral argument to the events of August 2013. *See* 8/16/2016 Hr'g Tr. at 49:17-19 (counsel for Plaintiff Proctor agreeing with Court that pre-2012 allegations "are not necessary to a well pled complaint"); *see also id.* at 68:14-17 (counsel for Plaintiffs Kohler, Ridgell, Zagami, and Jacobs agreeing with Court that pre-2012 allegations "are of tangential relevance" and that "[w]hat's really key here is August of 2013 and the events of that month leading up to the day of the shooting"). With respect to the second category of allegations, the Complaints describe in detail the bizarre behavior of Mr. Alexis during his assignment to the Naval Undersea Warfare Center in Newport, Rhode Island on August 4-7, 2013. One may conclude from these allegations (*e.g.*, complaining of hearing voices, being followed, and being tormented by electronic low-frequency waves) that Mr. Alexis suffered from a mental illness at that time. However, the allegations do not lead to an inference of future violent behavior. To conclude otherwise would contribute to the perpetuation of the false notion that mentally-ill individuals are predisposed or likely to be violent, a stereotype that would create undesirable incentives in the employment context.[26]

---

[25] Counsel for Plaintiff Proctor indicated at oral argument that this allegation "is a perfect example for why discovery should be allowed to proceed in this case." 8/16/2016 Hr'g Tr. at 50:19-20. However, discovery would be nothing more than a speculative fishing expedition.

[26] If it were true that exhibiting symptoms of psychosis is sufficient to put an employer on actual or constructive notice of an employee's future violent behavior, many employers may be reluctant to hire individuals with some kind of mental illness or disorder in violation of the American with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

Indeed, the D.C. Circuit stated in *Hicks v. United States* that "[g]eneralizations must be avoided as much as possible in the area of psychiatry" and, thus, a "claim of negligence must be considered in light of the elusive qualities of mental disorders and the difficulty of analyzing and evaluating them." 511 F.2d 407, 415 (D.C. Cir. 1975). Such generalizations were not always "avoided" in Plaintiffs' briefs and pleadings. *See* McCullough Opp'n, Case No. 15-1639 [Dkt. 21] at 16 (stating that "there is a consistent profile for the active shooter: these people are *crazy* — not merely angry, disgruntled or neurotic — *crazy*[; i]t is the *sine qua non* for the active shooter — *crazy*") (emphasis added). The Court concludes that awareness of Mr. Alexis's episode of mental illness did not automatically impose a duty of care on HPES and The Experts.

Nonetheless, there are allegations that, combined with the symptoms of mental illness exhibited by Mr. Alexis during August 4-7, 2013, barely push Plaintiffs' claims of negligent retention and supervision over the plausibility threshold of *Twombly*. For example, Plaintiffs allege that: (1) on August 4, 2013, the project coordinator for The Experts had to calm down an angry Mr. Alexis over the phone and persuade him to get away from a male seated across the aisle from him at the Norfolk Airport; (2) on August 6, 2013, the travel coordinator for The Experts contacted the desk clerk at the Navy Gateway Inns & Suites and expressed her concern that Mr. Alexis could harm someone; (3) the hotel's desk clerk contacted the Naval Station Newport Police to request that a police officer be assigned close to the hotel in case Mr. Alexis attempted to hurt someone; and (4) on August 7, 2013, the Newport Police Officer-in-Charge contacted the Naval Station Police Sergeant to relay the information concerning Mr.

Alexis and fax him a copy of a police report with a note saying, "FYI on this. Just thought to pass it on to you in the event this person escalates."[27]

These allegations, in combination with Mr. Alexis's behavior at the Norfolk Airport and in Rhode Island, could support an inference that HPES and The Experts were on actual or constructive notice that Mr. Alexis behaved in a "dangerous or otherwise incompetent manner" and that he might harm others or create an unreasonable risk of bodily harm to others. *Giles*, 487 A.2d at 613; *see also Fleming*, 80 A.2d at 917 (citing Restatement (First) of Torts § 302, cmt. n); Restatement (Second) of Torts § 317 and § 319. Based on the allegations in the Complaints, the Court cannot say that a jury might not find that HPES and The Experts had a duty to properly supervise or control Mr. Alexis, which they might have breached by failing to provide adequate supervision when authorizing Mr. Alexis to enter the Navy Yard.[28] *See Int'l Distrib. Corp.*, 569 F.2d at 139 (stating that "an employer has a duty to supervise those of its employees who are privileged because of their employment to enter another's property"); *cf. Phelan*, 805 A.2d at 938-40.

Accordingly, Plaintiffs' claims of negligent retention and supervision shall proceed to discovery so that the parties will have a more detailed factual foundation for their claims and their allegations of foreseeability. Upon further detail about the nature of the risk of harm to others, everyone will be in a better position to "balanc[e] the magnitude of the risk against the utility of [Defendants'] conduct" by taking into account the necessary factors, such as

---

[27] Neither HPES nor The Experts contest the sufficiency of the allegations with respect to what they knew or should have known about the series of events in August 2013.

[28] HPES and The Experts generally focused on the interplay between duty and foreseeability and did not challenge the sufficiency of Plaintiffs' allegations with respect to the adequacy of supervision (*i.e.*, breach of the duty of care).

"the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, . . . the gravity of the harm that may result, . . . [and] the burden of the precautions which the [Defendants] would be required to take." *Smith*, 481 F. Supp. 2d at 190 (quoting *Doe*, 524 A.2d at 34 n.3; Restatement (Second) of Torts § 302B, cmt. f). The motions to dismiss these claims will be denied.

### Claim #2: HPES negligently retained and supervised The Experts

Plaintiffs Kohler, Ridgell, Zagami, and Jacobs assert in their Complaints that HPES negligently retained and supervised The Experts. *See* Kohler Compl. ¶¶ 89-91; Ridgell Compl. ¶¶ 87-89; Zagami Compl. ¶¶ 89-91; Jacobs Compl. ¶¶ 99-101. At oral argument, counsel for HPES conceded that it did not address this claim in its motion to dismiss. *See* 8/16/2016 Hr'g Tr. at 13:24-14:8. Since HPES did not move to dismiss this claim and Plaintiffs have alleged sufficient facts to state a claim that The Experts acted negligently with respect to Mr. Alexis, the Court will allow this additional claim against HPES to proceed to discovery.

### iv.    Plaintiffs' Remaining Claims of Common Law Negligence

In addition to the theories of negligent hiring, retention, or supervision, Plaintiffs have asserted other claims of negligence against HPES and The Experts, using different labels to describe their claims, such as "negligent undertaking," "negligence," "negligent credentialing," "gross negligence," "reckless disregard," and "failure to warn."[29] Some Plaintiffs have also used

---

[29] *See* Delorenzo Compl. Counts I and II (including "failure to warn" claim against HPES and The Experts); Frasier Compl. Counts I and II (including "negligence" and "failure to warn" claims against HPES and The Experts); Proctor Compl. Counts V and VI (alleging claims of "negligence" under NISPOM and "other applicable law" against HPES and The Experts); Halmon-Daniels Compl. Counts II and IV (alleging "failure to warn" claims against HPES and Experts); Kohler/Ridgell/Zagami/Jacobs Compls. Counts II, III, V, and VI (alleging claims of "negligent undertaking" and "negligence" against HPES and The Experts); and McCullough Compl. Counts I and III (alleging claims of "negligence," "gross negligence," "failure to warn,"

the terms "survival action" and "wrongful death action" as separate claims against HPES and The Experts.[30] These claims will be dismissed as discussed below.

Many of these claims rely on different labels to reiterate the theories of negligent hiring, retention, and supervision. It is well established that "[a]s a matter of judicial economy," courts "may dismiss duplicative claims in [their] discretion." *DTCC Data Repository (U.S.) LLC v. U.S. Commodity Futures Trading Comm'n*, 25 F. Supp. 3d 9, 18-19 (D.D.C. 2014) (citing *Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 81 (D.D.C. 2010)). "Claims are duplicative when they 'stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available.'" *Id.* (quoting *Wultz*, 755 F. Supp. 2d at 81). Such is the case here. Plaintiffs remaining negligence claims stem from the same fact allegations and rely on the same theory of liability — specifically, that despite an actual or constructive awareness that Mr. Alexis could harm others, HPES and The Experts hired and retained Mr. Alexis and authorized him to enter the Navy Yard while failing to take adequate measures to prevent the ensuing harm on September 16, 2013.

### Negligent Undertaking, Negligence, and Negligent Credentialing

Plaintiffs Kohler, Ridgell, Zagami, and Jacobs assert a "negligent undertaking" claim against The Experts on the basis that "[b]y hiring Mr. Alexis . . . The Experts undertook to

---

"reckless disregard," "negligent credentialing," and "negligent performance of duties" against HPES and The Experts).

[30] *See* Halmon-Daniels Compl. Counts V and VI; Kohler/Zagami Compls. Counts IX and X; and Ridgell Compl. Counts VIII and IX. To clarify, a claim of wrongful death and/or survival does not constitute an independent theory of liability against Defendants. Instead, they refer to the statutory right of action under D.C. law and the nature of recoverable damages for each theory of liability. While a "wrongful death action is to recover damages to beneficiaries resulting from decedent's death," a survival action is "to recover damages the decedent could have recovered but for his death." *Azzopardi v. Ocean Drilling & Exploration Co.,* 742 F.2d 890, 893 (5th Cir. 1984).

control Mr. Alexis, whom The Experts knew was likely to cause harm to others in and around his workplace" and that The Experts breached this duty by failing to conduct an adequate investigation of Mr. Alexis prior to his hiring and, after the events of August 2013, failing to take adequate supervisory measures and failing to prevent Mr. Alexis from having access to the Navy Yard. Kohler Compl. ¶¶ 73-77; Ridgell Compl. ¶¶ 71-75; Zagami Compl. ¶¶ 73-77; Jacobs Compl. ¶¶ 83-87.  These Plaintiffs also assert the same claim with identical allegations against HPES vis-à-vis its alleged control over The Experts and Mr. Alexis.  *See* Count V in Complaints of Kohler, Ridgell, Zagami, and Jacobs.

Similarly, Plaintiffs Kohler, Ridgell, Zagami, and Jacobs assert claims of "negligence" against The Experts on the basis that:

> The Experts, as the employer of Mr. Alexis and because it knew that he was likely to cause harm to others in and around his workplace . . . owed persons working at the Washington Navy Yard . . . [a] duty to exercise reasonable care in supervising and controlling Mr. Alexis, including but not limited to controlling his access to the Washington Navy Yard and his return to employment, so as to prevent him from intentionally harming others and to prevent him from conducting himself so as to create an unreasonable risk of bodily harm to others.

Kohler Compl. ¶ 79; Ridgell Compl. ¶ 77; Zagami Compl. ¶ 79; Jacobs Compl. ¶ 89.  These Plaintiffs allege that The Experts breached its duty to control and supervise Mr. Alexis by failing to "create, develop, or implement an adequate risk assessment or mitigation plan with respect to employees who posed a risk of workplace violence, failing to [require or] adequately conduct a psychological fitness examination, . . . failing to revoke Mr. Alexis's security clearance, [and] failing to bar Mr. Alexis from access to the Washington Navy Yard," among other things.[31]

---

[31] Under this "negligence claim," Plaintiffs Kohler, Ridgell, Zagami, and Jacobs include a "failure to warn" or "report" claim against both HPES and The Experts, which is discussed separately below.

Kohler Compl. ¶ 83; Ridgell Compl. ¶ 81; Zagami Compl. ¶ 83; Jacobs Compl. ¶ 93.  In other words, their Complaints allege that HPES and The Experts failed to take adequate supervisory measures to prevent the shooting.  The same claim of "negligence" with identical allegations is made against HPES in light of its alleged duty to control and supervise The Experts and Mr. Alexis.  *See* Kohler/Ridgell/Zagami/Jacobs Compls. Count VI.  Plaintiff McCullough asserts a similar, if not identical, claim of "negligence" against HPES and The Experts.  *See* McCullough Compl. Count I.

Plaintiff McCullough also asserts a claim of "negligent credentialing" against HPES and The Experts, which is not recognized in the District of Columbia and is not applicable to the facts of this case.  *Cf.* Benjamin J. Vernia, *Tort Claim for Negligent Credentialing of Physician*, 98 A.L.R. 5th 533 (2002) (discussing the tort of "negligent credentialing" as one recognized in other jurisdictions in the medical malpractice context of extending privileges to physicians).[32]

Ultimately, these claims of "negligent undertaking," "negligence," and "negligent credentialing," stem from identical allegations and rely on the same underlying theory of liability as the Plaintiffs' claims of negligent hiring, retention, and supervision.  Common to all of these theories is the proposition that HPES and The Experts had a duty to exercise reasonable care in hiring and retaining a competent employee, as well as controlling and supervising an employee's actions, and, by failing to take adequate supervisory, precautionary measures, they breached that duty and proximately caused Plaintiffs' injuries.  Clearly, the claims are duplicative.

---

[32] In addition, Plaintiff McCullough abandoned the claim by failing to oppose the argument by The Experts that there is no "negligent credentialing" claim in the District of Columbia.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd,* 98 Fed. App'x. 8 (D.C. Cir. 2004).

Notably, Plaintiffs did not address these claims in their opposition briefs or at oral argument. In fact, although HPES and The Experts moved to dismiss all claims rooted in common law negligence, Plaintiffs only discussed the companies' alleged duty of care in hiring, retaining, and supervising Mr. Alexis, as well as the duty to warn others about the alleged risk of harm posed by Mr. Alexis. Perhaps realizing that their claims were duplicative, Plaintiffs chose to abandon many of them by failing to argue them as distinct theories of liability. *See Hopkins*, 284 F. Supp. 2d at 25 ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citations omitted). The claims will be dismissed as duplicative or, in the alternative, as conceded.

### Failure to Warn as Common Law Negligence

Despite using different labels, Plaintiffs allege that HPES and The Experts had a duty of care to warn invitees to the Navy Yard and the Navy/DoD about the risk of harm posed by Mr. Alexis. Plaintiffs contend that HPES and The Experts breached that duty to warn and proximately caused their injuries. This theory of liability corresponds to an ordinary negligence claim, which is why most Plaintiffs included it under their "negligence" counts. *See* Delorenzo Compl. Counts I and II; Frasier Compl. Counts I and II; Proctor Compl. Counts V and VI; Kohler/Ridgell/Zagami/Jacobs Compls. Counts III and VI; and McCullough Compl. Count I. Moreover, the duty to warn may arise: (1) at common law and/or (2) pursuant to a contractual or statutory obligation (more on this category later).

As discussed above, Plaintiffs' position at this stage has been that their claims of negligent hiring, retention, and supervision are fundamentally different and do not require specific foreseeability evidence. In so arguing, they failed to discuss or identify the applicable

standard for a negligence claim based on a failure-to-warn theory at common law. Instead of addressing the common law theory, Plaintiffs chose to focus exclusively on an alleged contractual and/or statutory obligation to warn the Navy/DoD. As a result, Plaintiffs have abandoned this common law theory. *See Hopkins*, 284 F. Supp. 2d at 25.

A negligence claim for failure to prevent a criminal act, which does not rely on a duty to control or supervise, requires specific evidence of foreseeability. *See Boykin*, 484 A.2d at 564-65; *Lacy* 424 A.2d at 323-24. There is no authority for the proposition that there is a duty to warn a third party with whom there is no special relationship, especially in the context of an invitee to someone else's property.[33] Absent a duty of protection, which is the focus of the failure to warn claim, the events of August 4-7, 2013 cannot support any inference that this criminal act at the Navy Yard was foreseeable. *Sigmund I*, 475 F. Supp. 2d at 42 ("While a plaintiff is not required to show previous occurrences of the particular type of harm at issue, the D.C. Court of Appeals requires proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location.") (citations omitted); *see also Bd. of Trustees of Univ. of D.C. v. DiSalvo*, 974 A.2d 868 (D.C. 2009).

Accordingly, these Plaintiffs' negligence claims based on a common law theory of failure to warn will be dismissed as conceded or, in the alternative, for failure to state a claim.

---

[33] The only exception of which the Court is aware is the duty to warn foreseeable victims of mental patients originated in *Tarasoff v. Regents of the University of California*, 551 P.2d 334 (Cal. 1976). Under this limited exception, "the special relationship between a patient and a psychotherapist creates a duty to third persons," so long as the intended victim is "identifiable." *White v. United States*, 780 F.2d 97, 108 (D.C. Cir. 1986) (citations omitted). Plaintiffs neither point to any other circumstance nor rely on any authority applicable to the circumstances at hand.

### 2.  Negligence *Per Se* and Statutory Duty Theories

To recapitulate, the basic elements of a negligence claim are:  the existence of a duty of care, the breach of that duty of care, and an actual injury proximately caused by the breach.  The Court evaluated above Plaintiffs' claims in which the requisite duty and standard of care are supplied by the D.C. common law of negligence.  Plaintiffs also assert claims in which the duty or standard of care, or both, are supplied by contract or statute.  When a court uses a statute or regulation to modify a preexisting common law negligence action and to provide the requisite duty and standard of care for a negligence claim, it is a claim of negligence *per se*.  *See Chadbourne v. Kappaz*, 779 A.2d 293, 295-96 (D.C. 2001); *Jarrett v. Woodward Bros.*, 751 A.2d 972, 977 (D.C. 2000).  However, when there is no preexisting common law negligence cause of action and a plaintiff seeks tort liability based on a statutory duty owed to him, courts refer to it as a statutory duty action in tort.  *See* Caroline Forell, *The Statutory Duty Action in Tort: A Statutory/common Law Hybrid*, 23 Ind. L. Rev. 781, 797-801 (1990) (discussing the difference between negligence *per se* and statutory duty cases and analyzing two statutory duty actions in the District of Columbia — *Turner v. District of Columbia*, 532 A.2d 662 (D.C. 1987) and *Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268 (D.C. 1987)); *see also Williams v. Invenergy, LLC*, No. 3:13-CV-01391-AC, 2014 WL 7186854, at *7 (D. Or. Dec. 16, 2014)

Specifically, Plaintiffs allege that:  (1) HPES and The Experts had a contractual duty to report to the Navy/DoD the events of August 4-7, 2013 and to warn them about the risk of harm posed by Mr. Alexis; and (2) HPES and The Experts were required under NISPOM to report any adverse information of Mr. Alexis up the chain-of-command to DoD Central Adjudication Facility and the Navy.  Plaintiffs Kohler, Ridgell, Zagami, and Jacobs also allege that HPES and The Experts were required under the D.C. Industrial Safety Act (ISA), D.C.

Code. §§ 32-801 to -812, and the Occupational Safety & Health Act (OSHA)[34] to furnish a reasonably safe place of employment.   Plaintiff Delorenzo also purports to allege an identical claim under OSHA; however, OSHA is nowhere to be found in either Count I (against HPES) or Count II (against The Experts) of her Complaint.

At the outset, the Court will dismiss Plaintiffs' negligence contract-based claims. Generally, no tort arises from a negligent breach of contract.  *See KBI Transp. Servs. v. Med. Transp. Mgm't., Inc.*, 679 F. Supp. 2d 104, 108 (D.D.C. 2010).  This maxim holds true here because Plaintiffs could not bring a breach of contract action as they were neither parties nor intended beneficiaries of any relevant contract (*e.g.*, the contract between HPES and The Experts or the Contract between Navy and HPES).  Moreover, "[a] breach of contract may *only* give rise to a tort claim when there is an independent basis for the duty allegedly breached."  *See id.* at 108-09 (emphasis added).  In this instance, Plaintiffs' contract-based claims focus on the fact that HPES and The Experts were required to comply with NISPOM and report any adverse information concerning Mr. Alexis.  The contract-based claims are duplicative of the negligence NISPOM-based claims.  As such, the Court will dismiss Plaintiffs' negligence claims based on a contractual duty.

The Court will also dismiss the negligence OSHA-based claim of Plaintiffs Kohler, Ridgell, Zagami, and Jacobs because they failed to oppose the motions to dismiss this claim in their opposition briefs and at oral argument.  *See Hopkins*, 284 F. Supp. 2d at 25.  With respect to Plaintiff Delorenzo, the Court finds that she did not raise an OSHA-based claim in her Complaint and her opposition brief was not the proper procedural vehicle to amend her

---

[34] Plaintiffs fail to specify whether their claims are based on the federal OSHA statute, 29 U.S.C. §§ 651-78, or the D.C. OSHA statute, D.C. Code §§ 32-1101 to -1124 (2001).  Both statutes are identical in all material respects. *See* D.C. Code § 32-1103(a)(1).

complaint.  In addition,  the OSHA-based claims of these Plaintiffs lack merit because OSHA

was designed to mitigate and prevent industrial accidents and occupational diseases, not violent

criminal conduct.  *See Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1205-06 (10th Cir. 2009)

(noting "the absence of *any* specific OSHA standard on workplace violence" and that "OSHA is

aware of the controversy surrounding  firearms in the workplace and has consciously  decided *not*

to adopt a standard") (emphasis in original).

### i.      Negligence under NISPOM

Plaintiffs' claims under NISPOM are styled as negligence *per se*.  Plaintiffs rely

on NISPOM to modify  and expand the preexisting  common law duty to warn and to hold HPES

and The Experts negligent  as a matter of law for failing  to comply with the standards articulated

in NISPOM.  Under D.C. law, "violation  of a statute or regulation  may constitute negligence as a

matter of law," that is, negligence *per se*.  *Dine v. W. Exterminating Co.*, No. CIV.A. 86-

1857(OG),  1988 WL 25511, at *4 (D.D.C. Mar. 9, 1988).[35]  Critically,  "[n]ot every statutory or

regulatory violation,  however, permits a plaintiff  to bypass the duty and breach of duty elements

of a negligence claim."  *Id.*  In this context, "where a particular statutory or regulatory standard is

enacted to protect persons in the plaintiff's  position  or to prevent the type of accident that

occurred, and the plaintiff  can establish his relationship  to the statute, unexplained  violation  of

that standard renders the defendant negligent  as a matter of law."  *Ceco Corp. v. Coleman,* 441

A.2d 940, 945 (D.C. 1982) (quoting  *Richardson v. Gregory,* 281 F.2d 626, 629 (D.C. Cir.

1960)).  "If, however, the defendant produces evidence tending to excuse or explain the

---

[35] Although  NISPOM is neither a statute nor a regulation,  but rather an operating manual
defining  security requirements  for cleared defense contractors, HPES and The Experts assume
*arguendo* that Plaintiffs  may rely on NISPOM to supply the duty and standard of care for their
claims.  The Court will  do the same and assumes, without deciding,  that NISPOM could be
relied upon to assert a negligence *per se* claim.

violation, the violation may be considered evidence of negligence rather than negligence *per se*." *Chadbourne*, 779 A.2d at 295 (citations omitted).

In the case of an intervening criminal act, as here, D.C. law requires that "the third-party criminal conduct" be "'the very injury . . . which the statute intended to prevent.'" *Romero*, 749 F.2d at 83 (quoting *Janof v. Newsom*, 53 F.2d 149, 152 (D.C. Cir. 1931)). In the same way that D.C. courts, "in their development of common-law tort rules, have imposed especially stringent requirements to support" civil liability for third-party criminal conduct, "they would similarly require a clear indication of a statutory purpose producing such liability." *Id.* Thus, the statutory purpose must be narrowly defined to match the criminal conduct as closely and precisely as possible. *See id.* (rejecting negligence *per se* theory under the D.C. Firearms Control Regulation Act of 1975, D.C. Code Ann. §§ 6-2301 to -2380 (1981), because "neither the nature of the provision in question nor its legislative history clearly indicates a purpose of preventing crimes by gun-thieves") (citation omitted). Consequently, the relevant question is whether Plaintiffs can establish that NISPOM was intended specifically to prevent violent crimes (*i.e.*, mass murder) at a federal facility (*i.e.*, military base).

NISPOM requires defense contractors, such as HPES and The Experts, to convey pertinent derogatory information of cleared personnel to DoD's Central Adjudication Facility via "incident reports" through the Joint Personnel Adjudication System (JPAS). JPAS is the system of records for personnel security clearance adjudication and management. By receiving incident reports with derogatory or adverse information, DoD can determine whether the information tends to demonstrate the individual's inability to safeguard classified information and whether his/her security clearance, which is a prerequisite to work on the Contract, should be revoked. *See generally* HPES MTD, Ex. B to Raofield Decl. (NISPOM); *see also* Proctor Compl. ¶¶ 18-

19.  Plaintiffs contend that if HPES and The Experts had reported the events of August 4-7, 2013 through JPAS, DoD would have revoked Mr. Alexis's security clearance and he would not have been able to access the Navy Yard in September 2013.  Even if this speculative chain of events were taken as true, it does not advance Plaintiffs' theory because NISPOM was not issued to prevent violent criminal conduct, let alone mass murder at the workplace.

NISPOM was issued as part of the National Industrial Security Program established in Executive Order 12,829 to prevent the unauthorized disclosure of classified information.  *See* Exec. Order No. 12,289, 58 C.F.R. 3479, as amended 58 Fed. Reg. 3479 (January 6, 1993).  The Executive Order clearly states: "The purpose of this [National Industrial Security Program] is to *safeguard classified information* that may be released or has been released to current, prospective, or former contractors, licensees, or grantees of United States agencies."  *Id.* § 101 (emphasis added).  Executive Order 12,289 identifies the purpose of NISPOM as to "prescribe specific requirements, restrictions, and other safeguards that are necessary *to preclude unauthorized disclosure and control authorized disclosure of classified information* to contractors, licensees, or grantees."  *Id.* § 201 (emphasis added); *see also* NISPOM § 1-100 (defining purpose of NISPOM) & § 1-300 (defining reporting obligations for events "that affect proper safeguarding of classified information . . . to enable [DoD] to determine whether classified information is protected").

Since the purpose of NISPOM was not to protect individuals from violent crimes at the workplace, Plaintiffs' negligence claims under NISPOM will be dismissed.  *See Lewis v. United States*, 83 F. Supp. 3d 198, 210 (D.D.C. 2015); *Hunter ex rel. A.H. v. District of Columbia*, 64 F. Supp. 3d 158, 190 (D.D.C. 2014).

### ii.      Negligence under ISA

The D.C. Industrial Safety Act provides in relevant part that "[e]very employer shall furnish a place of employment which shall be reasonably safe for employees, shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably safe and adequate to render such employment and place of employment reasonably safe." D.C. Code § 32-808(a).[36]  Plaintiffs Kohler, Zagami, Ridgell, and Jacobs argue that ISA establishes a statutory duty of care that is actionable in tort.[37] There are two fatal problems with this theory of liability.

The first problem with Plaintiffs' allegations is that ISA was enacted to prevent workplace-related accidents and, thus, it does not establish a duty to prevent violent criminal conduct.  When interpreting a statute, the first step is to "look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning, while construing the words in their ordinary sense and with the meaning commonly attributed to them." *Dobyns v. United States*, 30 A.3d 155, 159 (D.C. 2011) (internal quotation marks and citation omitted). In addition, courts "may appropriately look beyond plain meaning:

---

[36] The statute defines "employer" as any person or entity (not including the District of Columbia or the United States, or any instrumentality thereof) "having control or custody of any place of employment or of any employee."  D.C. Code § 32-802(1).  The statute defines "place of employment" as "any place where employment is carried on," including "any and all work of whatever nature being performed by an independent contractor for the United States government or any instrumentality thereof . . . ." *Id.* § 32-808(4).

[37] HPES and The Experts treated the negligence claim under ISA as one of negligence *per se*.  At oral argument, counsel for Plaintiffs Kohler, Ridgell, Zagami, and Jacobs argued that characterizing their claims as negligence *per se* would "miss[] the thrust of [their] complaint and of [their] argument" and that their claims are styled as a statutory duty action. 8/16/2016 Hr'g Tr. at 80:5-14.  Because, as explained in the text, ISA is inapplicable and does not impose a duty on HPES and The Experts to prevent the criminal acts of Mr. Alexis, the disagreement concerning the nature of the claims is immaterial.

> where (1) a review of the legislative history or an in-depth consideration of alternative constructions of the statutory language reveals ambiguities that the court must resolve; (2) the literal meaning of the statute produces absurd results; (3) the plain meaning construction leads to an obvious injustice; or (4) refusal to adhere to plain meaning is necessary in order to effectuate the legislative purpose of the statute as a whole.

*Id.* (internal quotation marks omitted).

The purpose of ISA "is to foster, promote, and develop the safety of wage earners of the District of Columbia in relation to their working conditions." D.C. Code § 32-801. Plaintiffs Kohler, Zagami, Ridgell, and Jacobs construe this broad statement to include any sort of danger or risk, including mass murder. To support their argument, they rely on the statute's definition of "safe" and "safety" as "such freedom from danger to life or health of employees as circumstances reasonably permit." *See id.* § 32-802(3) (adding that the definition "shall not be given any restrictive interpretation so as to exclude any mitigation or prevention of a specific danger"). The statute's purpose, as well as the definition of "safety," are ambiguous, given the breadth of the language. The "mitigation or prevention of a specific danger" might refer to the risk of harm posed by an accident, an intentional tort, or a criminal act.

The ISA general language does not "clearly indicat[e]" a statutory purpose to prevent violent criminal conduct. *Romero*, 749 F.2d at 83. In the absence of such "clear indication" in the text, the Court looks past the statutory text. *Id.* (emphasis added). And indeed, the legislative history directly contradicts the interpretation of ISA argued by Plaintiffs Kohler, Zagami, Ridgell, and Jacobs. That history unambiguously shows that the true purpose of the statute is to mitigate and prevent work-related accidents. The D.C. Court of Appeals in *Martin v. George Hyman Construction Co.* stated in relevant part: "The congressional purpose [of ISA] in imposing this greater duty of care toward wage earners is evident from the legislative history of

the [statute]. Congress was concerned with the 'appalling numbers' of wage earners *injured in employment-related 'accidents.'*" 395 A.2d 63, 70 (D.C. 1978) (quoting H.R. Rep. No. 918, 77th Cong., 1st Sess. 2 (1941); S. Rep. No. 675, 77th Cong., 1st Sess. 2 (1941)) (emphasis added). The court further stated:

> The congressional determination that "most of these *accidents* are due to lack of proper supervision and control" is an implicit recognition that wage earners will not always exercise due care for their own safety. Finding that these *accidents* "could be avoided if proper safety measures were taken" Congress imposed upon employers (as broadly defined) the sole *responsibility for avoiding those accidents.* In so doing, Congress established a new standard of care which . . . requires the exercise of due care *for the prevention not only of injuries to which wage earners do not contribute but all "accidents" which might be avoided by the employer's care. See generally* 87 Cong. Rec. 7658 (1941) (remarks of Rep. Randolph) (purpose of legislation is "*accident-prevention*") . . . . This court is not free to disregard the command of Congress nor to frustrate its unequivocal intent.

*Id.* at 70-71 (emphasis added).

Without a single reference to workplace violence or criminal conduct in ISA's legislative history, the congressional record is replete with references to accident prevention as its purpose. Those cases recognizing negligence claims under ISA, relied upon by Plaintiffs, involved work-related accidents, not intentional torts or criminal conduct. *See, e.g., Traudt v. Potomac Elec. Power Co.*, 692 A.2d 1326, 1329-32 (D.C. 1997) (negligence claim for burns sustained by employee while removing asbestos); *Fry v. Diamond Constr., Inc.*, 659 A.2d 241, 247 (D.C. 1995) (negligence claim for injuries when employee fell off ladder); *Martin*, 395 A.2d at 65, 70-71 (negligence claim for injuries when employee fell on a staircase). There is no authority for the proposition that failure to anticipate and/or prevent a criminal act constitutes negligence under the statute.

Finally, the legislative history and relevant case law highlight a second problem with these Plaintiffs' reliance on ISA. That statute was designed to impose liability on employers who control either the premises of the workplace or the employee who suffers the injury. *See Traudt*, 692 A.2d at 1329-32; *Fry*, 659 A.2d at 247; *Martin*, 395 A.2d at 65, 70-71. ISA was enacted on the "implicit recognition that wage earners will not always exercise due care for their own safety" and, thus, the burden to provide for their safety is imposed on the employer as circumstances reasonably permit. *Martin*, 395 A.2d at 70. In the instant case, none of the victims was an employee subject to the control and custody of either HPES or The Experts. Similarly, the Navy (not HPES or The Experts) had control or custody of Building 197 at the Washington Navy Yard. The fact that HPES and The Experts might have had control or custody over Mr. Alexis is irrelevant under ISA.

Because neither the text of ISA nor its legislative history indicates a purpose of preventing violent criminal conduct in the workplace, the Court will dismiss those claims based on ISA.

### iii.   Negligence under 18 U.S.C. § 930 (Firearms in Federal Facilities) and Federal Policies/Manuals/Regulations

In her opposition and at oral argument, Plaintiff Delorenzo stated that her "Complaint adequately alleges a claim of negligence *per se* for violation of Title 18 United States Code § 930 (prohibiting possession of firearms on federal facilities)," and that it relies on this criminal statute to provide the requisite duty and standard of care. Delorenzo Opp'n to HPES MTD, Case No. 15-216 [Dkt. 127] at 3; *see also* 8/16/2016 Hr'g Tr. at 86:7-10.[38]   A

---

[38] This criminal statute provides, in relevant part, for the punishment of: (1) "whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility"; (2) "[w]hoever, with intent that a firearm or other dangerous weapon be used in the commission of a crime, knowingly possesses or causes to be present such firearm . . . in a

review of the counts against HPES and The Experts (Counts I and II respectively) in Plaintiff Delorenzo's Complaint shows no claim based on this criminal statute. Plaintiff Delorenzo makes various references to the statute as part of her Complaint's factual background and in Count III (against the United States) and Count IV (against John/Jane Does #1-5).[39] Counts I and II, which expressly mention NISPOM and the common law of negligence in the District of Columbia, do not include any claim of negligence *per se*, much less one based on this criminal statute.

In Counts I and II, Plaintiff Delorenzo alleges that HPES and The Experts breached their "duties of care to [c]omply with the laws (Federal) and common law of the District of Columbia in a non-negligent manner." Delorenzo Compl. ¶¶ 236(A), 267(A). This allegation was too vague to provide notice to Defendants that Plaintiff Delorenzo intended to assert a negligence *per se* claim based on 18 U.S.C. § 930. *See* Fed. R. Civ. P. 8(a). "Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments [and claims] squarely and distinctly, or forever hold its peace." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks and citation omitted). The Court finds that Plaintiff Delorenzo did not raise a negligence *per se* claim against HPES or The

Federal facility"; or (3) "[a] person who kills any person in the course of a violation of [the previous two subsections], or in the course of an attack on a Federal facility involving the use of a firearm . . . ." 18 U.S.C. § 930.

[39] On November 3, 2014, District Judge Steven D. Merryday in the U.S. District Court for the Middle District of Florida dismissed Count III (tort claims against United States) for lack of subject matter jurisdiction. *See* Order, Case No. 15-216 [Dkt. 85]. Count IV, which alleges a claim against unidentified federal employees under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) — the federal cause of action to recover for damages sustained by a violation of the U.S. Constitution by federal officers acting under the color of federal authority — remains.

Experts and she cannot rely on her opposition brief and statements during oral argument to amend her Complaint.

Moreover, even if Plaintiff Delorenzo had alleged a negligence *per se* claim based on this criminal statute, it would fail as a matter of law. "Violation of a statute may give rise to a civil cause of action, and may constitute negligence *per se* if the statute is meant to promote safety, if the plaintiff is 'a member of the class to be protected by the statute,' and if the defendant is a person 'upon whom the statute imposes specific duties.'" *McCracken v. Walls-Kaufman*, 717 A.2d 346, 354 (D.C. 1998) (quoting *Marusa v. District of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973)) (other citation omitted). Even if the criminal prohibition in 18 U.S.C. § 930 met all three requirements, Plaintiff Delorenzo has failed to allege any facts to show that HPES or The Experts knew about Mr. Alexis's possession of a shotgun or his intention to bring any firearm into the Navy Yard. At oral argument, counsel for Plaintiff Delorenzo stated that her negligence *per se* claim is supported by the fact that, based on the Navy Report and a retained expert on industrial security, "HP[ES] was obligated to physically deny [Mr.] Alexis access to the federal facilities until HP[ES] could fully understand and deal with [Mr.] Alexis's condition." 8/16/2016 Hr'g Tr. at 86:22-24. The argument miscasts the nature of a negligence *per se* claim.

Under this theory of liability, a statute provides both the duty and the standard of care. *See Chadbourne*, 779 A.2d at 295-96. As a result, Plaintiff Delorenzo may not rely on expert testimony to establish the appropriate standard of care as if it were a common law negligence claim. Moreover, Plaintiff Delorenzo's allegation purports to hold HPES and The Experts strictly liable for the shooting even if they did not "*knowingly* posess[] or cause[] to be present a firearm" at the Navy Yard. 18 U.S.C. § 930 (emphasis added). This analysis is inconsistent with a *per se* theory of liability. Plaintiff Delorenzo offers no facts to support her

allegation that HPES or The Experts violated this criminal statute. Therefore, even if such a claim were alleged in Counts I and II of the Complaint, it would be dismissed as a matter of law.

A similar reasoning applies to Plaintiff Delorenzo's plethora of executive orders, policies, manuals, regulations, guidelines, and other documents, which were mentioned in her opposition brief and her Complaint's factual background, but were not relied upon or mentioned in Counts I and II. *See* Delorenzo Opp'n to HPES MTD at 2, 26.[40]  As stated above, the Court finds that Plaintiff Delorenzo's Complaint does not make out a negligence *per se* claim. Moreover, her Opposition cites executive documents and refers to exhibits she attached to her Opposition, but does not explain how any of them meets the three criteria for a negligence *per se* claim. *See McCracken*, 717 A.2d at 354.  "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Zannino*, 895 F.2d at 17.

To be clear, none of these documents supports a negligence *per se* claim.  As with NISPOM, Executive Order 13,587 and its related regulations were promulgated to ensure the effectiveness of insider threat programs and to protect classified national security information. *See* Exec. Order No. 13,587, 3 C.F.R. 13587, 76 Fed. Reg. 63811 (October 7, 2001) (titled, "Structural Reforms to Improve the Security of Classified Networks and the Responsible Sharing and Safeguarding of Classified Information").  They were not designed to prevent workplace violence, let alone mass murder on a military base. With respect to the other documents regarding physical security and law enforcement within Navy or military installations, Plaintiff

---

[40] Some of the documents cited in her Opposition are: "Executive Order 13587: 'National Insider Threat Policy'; SECNAVINST 5510.37: 'Department of the Navy Insider Threat Program' . . . [;] OPNAVINST 5530.14E (April 19, 2010)[;] DoD Directive 5210.56 (Feb 25, 1992, reissued April 1, 2011); SECNAVINST 5510.37 (Aug. 8, 2013); SECNAV M-5510.30 (June 2006)."  Delorenzo Opp'n to HPES MTD at 2, 26 (alterations omitted).

Delorenzo has failed to show that these documents imposed specific duties on any entities other than the Navy — particularly not on HPES and The Experts, as to which there are no facts showing they had control over the physical premises of the Navy Yard, had law enforcement authority, and knew that one of its employees possessed a firearm to be used in the perpetration of a crime. Therefore, even if properly raised, Plaintiff Delorenzo failed to state a negligence *per se* claim upon which relief can be granted.

### 3. Theories of Vicarious Liability for Assault and Battery

Plaintiffs McCullough and Proctor assert three claims of assault and battery against HPES and The Experts based on a theory of vicarious liability, specifically, the doctrine of *respondeat superior.*[41] *See* McCullough Compl. Count II ("Assault & Battery"); Proctor Compl. Count VII ("Vicarious Liability – Wrongful Death") and Count VIII ("Vicarious Liability – Survival").

HPES and The Experts move to dismiss Count II of the McCullough Complaint and Count VIII of the Proctor Complaint because they are barred by D.C.'s one-year statute of limitations for assault and battery claims. *See* D.C. Code § 12-301(4). "The statute of limitations for a claim brought pursuant to the Survival Act is the statute of limitations applicable to the underlying claim, and the claim generally accrues on the date of the decedent's injury, and not on the date of the decedent's death." *Casey v. Ward*, 67 F. Supp. 3d 45, 53 (D.D.C. 2014), *reconsideration denied*, 67 F. Supp. 3d 54 (D.D.C. 2015) (internal quotation marks and citation omitted). Because the assault and battery claims underlying Plaintiff Proctor and McCullough's survival action accrued on September 16, 2013, and they filed their complaints on September 14,

---

[41] "*Respondeat superior* is a doctrine of vicarious liability and allows the employer to be held liable for the acts of his employees committed within the scope of their employment." *Penn Cent. Transp. Co. v. Reddick,* 398 A.2d 27, 29 (D.C. 1979) (citations omitted).

2015 (Proctor) and September 15, 2015 (McCullough) — "one year *after* the statute of limitations expired — their survival claims against [HPES and The Experts] based on assault and battery are therefore time-barred." *Casey*, 67 F. Supp. 3d at 53. In addition, Plaintiffs Proctor and McCullough failed to oppose this argument and, thus, conceded it. *See Hopkins*, 284 F. Supp. 2d at 25. Both claims will be dismissed as time barred or, in the alternative, as conceded.

Plaintiff Proctor's claim under D.C.'s wrongful death statute, which is governed by a two-year statute of limitations, remains outstanding. *See* D.C. Code § 16-2702. To state a claim against HPES and The Experts, Plaintiff Proctor must allege sufficient facts to support an inference that Mr. Alexis's conduct occurred within the scope of his employment as a computer technician. *Exxon Mobil Corp.*, 573 F. Supp. 2d at 24. Specifically, there must be sufficient "facts, which, if true, demonstrate that the alleged conduct of [an employee] was an outgrowth of their work assignments, or an integral part of their business activities, interests or objectives." *Keys v. WMATA*, 408 F. Supp. 2d 1, 4 (D.D.C. 2005). No such factual allegations can be found in Plaintiff Proctor's Complaint.

Conduct occurs within the scope of employment only if:

> (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228 (1958); *see also Schecter*, 892 A.2d at 431. "If the employees' conduct is different in kind from that authorized, far beyond time or space limits, *or* too little actuated by a purpose to serve the master, then the conduct is not within the scope of employment." *Majano v. United States*, 469 F.3d 138, 141 (D.C. Cir. 2006) (citing Restatement (Second) of Agency § 228) (emphasis added). Moreover, "[t]he key inquiry is the employee's

intent at the moment the tort occurred." *Id.* at 142.  Finally,  as then-Judge Scalia wrote in *Jordan v. Medley*: "A directed verdict against the employer would be particularly rare in the case of an intentional tort, which by its nature is willful and thus more readily suggests personal motivation."  711 F.2d 211, 215 (D.C. Cir. 1983).

Plaintiff Proctor argues that this is one of those rare cases in which there are sufficient facts to support a finding that Mr. Alexis was acting within the scope of his employment when he engaged in a murderous rampage at the Navy Yard.  The Court disagrees. Plaintiff Proctor argues that HPES and The Experts were "vicariously liable for [Mr.] Alexis's acts through theories of agency in the aid of execution and apparent authority."  Proctor Opp'n, Case No. 15-1494 [Dkt. 19] at 39-40 (citing Proctor Compl. ¶¶ 196-221).  Plaintiff Proctor relies on Restatement (Second) of Agency § 219(2)(d), which states in relevant part:

> A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless . . . the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

He also relies on *Doe v. Sipper* where a part-time female employee of defendant New Leaf Brands, Inc., sued the company after a company executive used his position to invite her to his hotel room to book airline tickets for upcoming trade shows and then raped her.  821 F. Supp. 2d 384, 386 (D.D.C. 2011).  The employee sought to hold the company liable for the executive's conduct on the basis of agency in aid of execution and apparent authority.  The court rejected the theory of apparent authority, but found that there were sufficient facts to support the theory of agency in aid of execution.  *See id.* at 390-93.

The Court finds that Mr. Alexis acted outside the scope of his employment when he opened fire indiscriminately in Building 197 on the Navy Yard, killing twelve individuals and

injuring four others. Plaintiff Proctor cannot show that committing mass murder at the Navy Yard was an outgrowth of Mr. Alexis's work assignment as a computer technician or that it was an integral part of his duties or business activities. *See Keys*, 408 F. Supp. 2d at 4; *cf. Murphy*, 458 A.2d at 62-63. Nor does Plaintiff Proctor allege that Mr. Alexis committed his crimes to further the interests of HPES and The Experts. *See Reddick,* 398 A.2d at 31 ("The employer will not be held liable for those willful acts, intended by the agent only to further his own interest, not done for the employer at all."); *see also* Frasier Compl. ¶ 47 (alleging that a note was found in Mr. Alexis's computer stating, "ultra low frequency attack is what I've been subject to for the last three months, and to be perfectly honest that is what has driven me to this").

Moreover, "[t]he moment the agent turns aside from the business of the principal and commits an independent trespass," such as here, "the principal is not liable" because "[t]he agent is not then acting within the scope of his authority in the business of the principal, but in the furtherance of his own ends." *Schechter*, 892 A.2d at 431 (quoting *Axman v. Washington Gaslight Co.,* 38 App. D.C. 150, 158 (1912)). Similarly, in *Boykin*, the D.C. Court of Appeals held that, even though the school employee's job "necessarily included some physical contact" with students, "a sexual assault may [not] be deemed a direct outgrowth of a school official's authorization to take a student by the hand or arm in guiding her past obstacles in the building." *Boykin*, 484 A.2d at 562. "If the instructor's actions in *Boykin* could not render his employer vicariously liable, it is hard to see how Plaintiff [Proctor] could prevail on that issue here." *Sipper*, 821 F. Supp. 2d at 389.

With respect to his theories of apparent authority and agency in aid of execution, Plaintiff Proctor's sole authority, *Sipper*, supports dismissal of his claim.[42] As in *Sipper*, his theory of apparent authority "can be easily dispensed with" because there is no factual basis to intimate that Mr. Alexis could "have 'purported to act or to speak on behalf of'" HPES or The Experts while shooting people indiscriminately. *Id.* at 391. Indeed, his victims had no "opportunity to even make th[e] determination" of whether to rely upon his alleged apparent authority. *Id.* Any assertion to the contrary is totally belied by the allegations in the Complaint.

Plaintiff Proctor's theory of agency in aid of execution fares no better. Plaintiff Proctor argues that "but for the building pass provided and visit scheduled by The Experts and/or HPES, [Mr.] Alexis would not have been able to commit this act." Proctor Opp'n at 40-41 (quoting Proctor Compl. ¶¶ 204, 217). Assuming the factual allegations to be true, they are insufficient. In *Sipper*, the court noted,

> The D.C. Circuit has acknowledged the superficial expansiveness of the standard. *See Gary,* 59 F.3d at 1397 ("In a sense, a supervisor is always 'aided in accomplishing the tort by the existence of the agency' because his responsibilities provide proximity to, and regular contact with, the victim."). Yet, as *Gary* explains, "The commentary to the Restatement suggests that this [approach] embraces a narrower concept that holds the employer liable only if the tort was 'accomplished by an instrumentality, or through conduct associated with the agency status.'" *Id.* (citing *Barnes v. Costle,* 561 F.2d 983, 996 (D.C. Cir. 1977) (MacKinnon, J., concurring)).

*Sipper*, 821 F. Supp. 2d at 392. The *Sipper* court identified multiple allegations to support an inference that the alleged sexual assault was "accomplished by an instrumentality, or through conduct associated with the agency status" of the perpetrator, *i.e.*, the executive allegedly used

---

[42] The Court assumes, without deciding, that Restatement (Second) of Agency § 219(2)(d) applies to common-law claims in the District of Columbia. *See Sipper*, 821 F. Supp. 2d at 391 (citing *Gary v. Long*, 59 F.3d 1391 (D.C. Cir. 1995)).

his authority to lure plaintiff to his hotel room with a work-related excuse (booking flight tickets for upcoming trade shows), even though he intended to have sex with her (forcibly or otherwise). *Id.* at 392-93 (citation omitted).

Plaintiff Proctor only alleges that HPES and The Experts provided Mr. Alexis with access to the Navy Yard. This fact is insufficient. "[P]rovid[ing] proximity to, and regular contact with, the victim" does not support an aid-by-agency-relation theory. *See Gary,* 59 F.3d at 1397. "It is a general principle of agency law that '[i]f a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.'" *Id.* (quoting Restatement (Second) of Agency § 166, cmt. a). Plaintiff Proctor cannot avail himself of the theories in § 219(d)(2) because he "could not have believed (and nor does []he claim) that [Mr. Alexis] was acting within the color of his authority." *Id.* at 1397-98; *cf.* Restatement (Second) of Agency § 219, cmt. e (including examples of a telegraph operator who sends false messages purporting to come from another, and of a store manager who uses his position to cheat customers).

HPES and The Experts did not provide Mr. Alexis with the instrumentality (the shotgun) that aided him in the commission of his horrific crime. *See Nichols v. Land Transp. Corp.*, 103 F. Supp. 2d 25, 28 (D. Me. 1999), *aff'd,* 223 F.3d 21 (1st Cir. 2000) (rejecting vicarious liability for employer who did not provide truck driver with knife used to stab plaintiff and where driver did not act as agent when he left his truck to confront plaintiff). Mr. Alexis's criminal conduct (mass murder) cannot be associated in any way with his status as a computer technician. *See id.*; *cf.* Restatement (Second) of Agency § 219, cmt. e.

The fact that an employee's work "afforded him an opportunity to" commit the crime is "insufficient to make [an employer] vicariously liable," without regard to the theory of liability. *Boykin*, 484 A.2d at 563-64. Accordingly, the Court rejects Plaintiff Proctor's scope-of-employment, apparent-agency, and aided-by-agency-relation theories. Plaintiff Proctor's claim for assault and battery under D.C.'s wrongful death statute will be dismissed for failure to state a claim.

### C. Motion to Dismiss by Security Firm HBC

Plaintiffs Kohler, Zagami, and Jacobs allege that HBC was negligent in failing to provide reasonable security measures to prevent the Navy Yard shooting. They argue that HBC voluntarily assumed a duty to provide security services at Building 197 on the Navy Yard and to protect those on its premises. In support, Plaintiffs Kohler, Zagami, and Jacobs argue that HBC assumed such a duty by its security contract with the Navy. *See* HBC Suppl. Mot., Ex. 1 [Dkt. 23-1] (HBC Contract). They argue that HBC's voluntary undertaking not only created a contractual duty to the Navy, but also, a special relationship between it and the victims that gave rise to a common law duty to exercise reasonable care in performing its security services. HBC moves to dismiss this common law negligence claim under Rule 12(b)(6).

"[A] determination of whether a duty exists is the result of a variety of considerations and not solely the relationship between the parties"; it "is also shaped by considerations of fairness and results ultimately from policy decisions made by the courts and the legislatures." *Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 888 (D.C. 2011) (quoting *DiSalvo*, 974 A.2d at 871 & n.2) (internal quotation marks and citation omitted)). In "determining whether a party who performs services under a contract for one party assumes a duty to an unrelated third party," D.C. courts have considered, although not formally adopted, § 324A of the Restatement (Second) of Torts. *Id.* at 889 (citing *Haynesworth v. D.H. Stevens*

*Co.*, 645 A.2d 1095, 1097 (D.C. 1994)); *see also Gilbert v. Miodovnik*, 990 A.2d 983, 994 n.15

(D.C. 2010) (noting that § 324A has not been formally adopted in the District of Columbia).

Section 324A provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> > (a) his failure to exercise reasonable care increases the risk of such harm, or
> >
> > (b) he has undertaken to perform a duty owed by the other to the third person, or
> >
> > (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. In light of the Restatement and "in the absence of

contractual privity with an unrelated third party," such as here, courts applying D.C. law have

looked "to the contract to determine the scope of the undertaking as it relates to the protection of

the third party." *Presley*, 25 A.3d at 888 (citing *Haynesworth*, 645 A.2d at 1098; *Caldwell v.*

*Bechtel, Inc.*, 631 F.2d 989, 1000-01 (D.C. Cir. 1980)).

Plaintiffs Kohler, Zagami, and Jacobs highlight several portions of the HBC-Navy

security contract to support their claim. Some of the most relevant portions of that contract

provided:

> ▪ The Contractor shall provide security operations to ensure security and safety for personnel, property, facilities, and assets (HBC 00069).
>
> ▪ The Contractor shall monitor interior patrol areas to ensure security breaches and criminal or suspicious activities are detected and reported in a timely manner (HBC 00072).

▪    [The Contractor has a general duty] [t]o protect [(Naval Sea Systems Command)] NAVSEA persons (military, civilians and visitors) and property (HBC 00222).

▪    [With respect to the NAVSEA Fixed Posts, the Contractor shall]:

    o   Take all reasonable precautions to protect the health and safety of all persons in the building(s) under guard, minimize the danger from all hazards to life and property, comply with all health, safety and fire protection regulations (including reporting requirements), and remove from duty any security guard employee who may have a communicable disease (HBC 00224).

    o   Deter the commission of assaults, batteries, robberies, rapes and other crimes of violence in the guard's area of responsibility by his/her presence (HBC 00223).

▪    Deadly force for NAVSEA Security Guards is justified . . . [w]hen deadly force reasonably appears to be necessary to protect law enforcement or security personnel who reasonably believe themselves or others to be in imminent danger of death or serious bodily harm . . . [or] to prevent commission of a serious offense involving violence and threatening death or serious bodily harm[, such as] murder, armed robbery and aggravated assault (HBC 00227-228).

*See* HBC Contract.  Clearly, HBC's contract includes various references to the promotion of safety and the protection of Navy Yard personnel against criminal acts.

The undertaking of a contractual duty is merely the point of departure.  "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else." *MacPherson v. Buick Motor Co.*, 111 N.E. 1050, 1053 (N.Y. 1916) (Cardozo, J.).  "The contract provides the initiating source of the duty" and since Plaintiffs Kohler, Zagami, and Jacobs have not "brought this action . . . for breach of contract but rather . . . for an asserted breach of the duty of reasonable care," the Court must consider many facts beyond the contract, such as any of the defendant's "superior

73

skills and position," and the defendant's "resultant *ability to foresee the harm* that might reasonably be expected to befall." *Caldwell*, 631 F.2d at 997, 998 n.12, 1000-02 (emphasis added) (finding that in light of the contract, special skills, knowledge of the dangerous condition, and ability to foresee the risk of harm and protect against such harm, the defendant assumed a special relationship to protect the foreseeable plaintiff from such risk).

While the contract references a duty to deter and report criminal activity and the authority to use deadly force to prevent a crime, it cannot be said that there is a duty (under the contract or at common law) to protect against *unforeseeable* criminal acts by third parties. [43] Foreseeability remains at the core of this negligence claim, even when liability is premised on a theory of voluntary undertaking. *See id.* at 993 ("The issue in this case, then, is whether the contractual authority vested in [defendant] with respect to job site safety regulations created a special relationship between [the parties to the suit] under which [defendant] owed a duty to [plaintiff] to take reasonable steps to protect him from the foreseeable risk to his health posed by the dust laden Metro tunnels."). Other jurisdictions are in agreement. *See Vu v. Singer Co.*, 538 F. Supp. at 33 (N.D. Cal. 1981), *aff'd*, 706 F.2d 1027 (9th Cir. 1983) ("Plaintiffs cannot prevail on this claim because the 'gratuitous undertaking' doctrine does not obviate the requirement that duty can only be predicated upon foreseeable harm to a foreseeable victim.") (citation omitted); *see also Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, 1436-39 (7th Cir. 1989)

---

[43] HBC points out that the prevention of unforeseeable crimes is impossible. *See E. Capitol View Cmty. Dev. Corp. v. Robinson*, 941 A.2d 1036, 1040 (D.C. 2008) ("A party's obligation to perform under a contract may be excused if performance is rendered impossible."). Notably, in tort law, "a duty of due care . . . is based primarily upon social policy," not a contract; therefore, it is society that "specifies to whom the duty is owed" (*i.e.*, the foreseeable plaintiff), as well as the "expectations of conduct, such as the expectancy that [defendant's] actions will not cause foreseeable injury to another." *Caldwell*, 631 F.2d at 997-98 (citing W. Prosser, *Handbook of the Law of Torts*, § 92 (4th ed. 1971)).

(stating that once college voluntarily provided security services to invitees on campus, liability could attach only for those injuries resulting from the kinds of crimes reasonably foreseeable to the college).

The tort concept of foreseeability is relevant to both elements of duty and proximate causation. *See* Opp'n to HBC MTD, Case No. 15-1636 [Dkt. 28] at 26 (citing *Rieser v. District of Columbia*, 563 F.2d 462, 479-80 (D.C. Cir. 2911), *vacated and reinstated in relevant part*, 580 F.2d 647 (D.C. Cir. 1978) (en banc) ("The question of proximate causation, like that of duty, is at base one of foreseeability. If a negligent, intentional or even criminal intervening act or end result was reasonably foreseeable to the original actor, his liability will not ordinarily be superseded by that intervening act.").[44] This concept of foreseeability is not abrogated or replaced in assumption of duty cases. As the D.C. Court of Appeals stated in *Haynesworth*:

> In a case of this nature, it is critical to determine whether a duty was owed by the alleged tortfeasor to the person claiming injury. Woven into this overall consideration is also the question of reasonable foreseeable risk to be perceived by the actor at the time of the incident. Stated another way, we must ask "whether the injury to that individual [to whom a duty was owed] was reasonably foreseeable to the defendant." *Powell v. District of Columbia,* 602 A.2d 1123, 1133 (D.C.1992) (citations omitted).

645 A.2d at 1098. Therefore, even assuming that HBC shared part of the Navy's duty to protect invitees on its premises from criminal acts,[45] Plaintiffs Kohler, Zagami, and Jacobs must still allege sufficient facts to show that the criminal actions of Mr. Alexis were foreseeable to HBC.

---

[44] Counsel for Kohler, Zagami, and Jacobs filed an identical Opposition to HBC's motion to dismiss and to HBC's supplemental brief in each of the three cases. For purposes of clarity, the Court will only use the docket numbers of the Kohler case for purposes of citations.

[45] HBC had no law enforcement authority and the Navy retained the ultimate authority to make decisions related to safety and security of the premises at the Navy Yard, particularly since

"Where an injury is caused by the intervening criminal act of a third party," the D.C. Court of Appeals "'has repeatedly held that liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent.'" *Beretta*, 872 A.2d at 641 (quoting *Potts*, 697 A.2d at 1252). Plaintiffs Kohler, Zagami, and Jacobs argue that in an assumption of duty case, HBC's actions establish its duties and the heightened foreseeability analysis is moot. Specifically, they argue that "[b]ecause HBC contractually undertook to protect [the victims] from harm and its special relationship with [the victims] encompassed a duty of protection, no heightened showing of foreseeability is required to subject HBC to liability." Opp'n to HBC's Suppl. Br. [Dkt. 35] at 7. To support this proposition, these Plaintiffs rely on a series of cases outside the District of Columbia, *see id.* at 3 n.4 & 8, as well as those D.C. cases that opine that a showing of heightened foreseeability is lessened where the relationship between the parties strongly suggests a duty of protection.

Assuming heightened foreseeability does not apply because the HBC-Navy contract and the ensuing relationship between the parties may suggest a duty of protection, *see Workman*, 320 F.3d at 264, Plaintiffs Kohler, Zagami, and Jacobs fail to offer sufficient facts that Mr. Alexis's criminal conduct was foreseeable. The Complaints do not show that it is foreseeable to a security guard at his or her NAVSEA post in Building 197 that someone holding a security clearance, authorized and assigned to work at the Navy Yard, in possession of a "valid temporary access badge or [(common access card)] CAC to pass through the electronic badge reader," and heading to his workstation on the fourth floor of Building 197 would commit mass murder. Kohler Compl. ¶ 19; Zagami Compl. ¶ 19; Jacobs Compl. ¶ 29. There is no allegation

---

military police also patrolled the premises. *See* HBC Contract at HBC 00224; *see also* 8/16/2016 Hr'g Tr. at 34:1-11.

that HBC had knowledge of Mr. Alexis's past behavior, character, or alleged propensity towards violence. Mr. Alexis was not a trespasser or an intruder; rather, to HBC, Mr. Alexis was simply another contractor going to work at the Navy Yard with lawful access to Building 197. Whether it is analyzed in terms of duty, breach, or proximate causation, the risk of harm to the victims was simply not foreseeable. In such circumstances, HBC did not stand "in a superior position," did not "fully posess[] the power to protect" the foreseeable plaintiffs, and did not have the ability to foresee this harm. *Caldwell*, 631 F.2d at 1002.

This factual void is in stark contrast with cases like *Caldwell* and *Cunningham v. District of Columbia Sports and Entertainment Commission*, where not only was the defendant armed with a contractual obligation, ability and special skills, but also, was informed of the harm that might reasonably be expected to occur to a foreseeable plaintiff. In *Caldwell*, the defendant owed a duty to a worker to take reasonable steps to protect him from foreseeable risks to his health because defendant was, among other things, "informed of high concentration of silica dust and inadequate ventilation in the subway tunnels" and had the authority to stop the work. *Id.* Similarly, in *Cunningham*, a security company hired to provide crowd management and guest services at a concert, owed a duty to plaintiff to protect him against injuries sustained as a result of a crowd crush incident because there was, among other things, evidence "that the crowd was pretty packed and everyone was close together," as well as of "crowd surfing" and "mosh pits." *Cunningham v. D.C. Sports & Entm't Comm'n*, No. Civ. A. 03-839RWRJMF, 2005 WL 3276306, at *1-2 (D.D.C. Nov. 30, 2005); *see also id.* at *8 ("Under these circumstances, [the security company] assumed a duty to act reasonably so that attendees of the concert would be protected from *foreseeable risks*.") (emphasis added).

Moreover, in cases where "the heightened foreseeability is lessened" due to a special relationship between the parties, foreseeability does not require "previous occurrences of a particular harm, but can be met instead by a combination of factors which give defendants an increased awareness of the danger of a particular criminal act." *Doe*, 524 A.2d at 33; *see also DiSalvo*, 974 A.2d at 872; *Sigmund I*, 475 F. Supp. 2d at 42. To meet this burden, Plaintiffs Kohler, Zagami, and Jacobs allege that Navy Yard and nine other military installations are "subject to a heightened risk of violent attacks, and in particular gun violence" because they each had "suffered a violent attack . . . prior to the September 16, 2013 shooting," specifically including the Navy Yard "on two separate occasions in 1983 and 1984." Kohler Compl. ¶ 9; Zagami Compl. ¶ 9; Jacobs Compl. ¶ 8. "Even if the relationship here did entail a greater duty of protection," *DiSalvo*, 974 A.2d at 872, the alleged facts fall short of the showing made in those cases that recognized a duty of protection vis-à-vis the sliding scale analysis. *See, e.g.*, *Novak*, 452 F.3d at 904; *Dominion Bank*, 963 F.2d at 1555-61; *Doe*, 524 A.2d at 34; *Kline*, 439 F.2d at 480.

"It is not sufficient to establish a general possibility that the crime would occur"; instead, Plaintiffs Kohler, Zagami, and Jacobs must allege sufficient facts to make it plausible that HBC "had an increased awareness of the risk of [a shooting and murder at the Navy Yard]." *DiSalvo*, 974 A.2d at 872. The fact that other military installations had suffered violent attacks over the past seventeen years does not support an "increased awareness" of the risk of a similar attack at the Navy Yard. *Sigmund I*, 475 F. Supp. 2d at 42 (noting that "the D.C. Court of Appeals requires proof that the specific type of crime, not just crime in general, be particularly foreseeable at the relevant location") (citations omitted). Moreover, the fact that the Navy Yard experienced two attacks more than thirty years ago is simply too remote to support any

negligence claim against HBC. A careful review of D.C. law on this issue shows that "the common thread" in all of these cases involving third-party criminal conduct is that the facts supporting an inference of foreseeability "showed, if not awareness of the precise risk, close similarity in nature or *temporal and spatial proximity* to the crime at issue." *DiSalvo*, 974 A.2d at 874 (emphasis added); *accord Sigmund II*, 617 F.3d at 516; *Figueroa*, 879 F.2d at 1436-39 (requiring similar evidence of foreseeability in a voluntary undertaking case under Illinois law).[46] The background allegations lack that temporal and spatial proximity to the shooting of September 2013.

On a final note, Plaintiffs Kohler, Zagami, and Jacobs often reduce their claim to a contractual issue. They argue that HBC's decision to enter into a contract to provide security services at the Navy Yard gave rise to a duty to protect the victims from criminal actions. *See* Opp'n to HBC MTD at 11-12 (stating that HBC "should not now, after the fact of its assumption of the duty to provide contractual security services at the Navy Yard . . . be permitted to escape liability on the basis that it did not see the potential harm"). This argument is at odds with the relevant caselaw. Under D.C. law, foreseeability as a function of duty (and proximate causation) remains an essential element of a negligence claim and is "shaped by considerations of fairness and results ultimately from policy decisions," as well as societal expectations. *Presley*, 25 A.3d at 888 (internal quotation marks and citation omitted). Courts look at the particular circumstances of each case and consider the terms of a contract, the defendant's skills and

---

[46] *But see Burns Int'l Sec. Servs. Inc. of Fla. v. Phila. Indem. Ins. Co.*, 899 So. 2d 361, 364-65 (Fla. Dist. Ct. App. 2005); *Vazquez v. Lago Grande Homeowners Ass'n*, 900 So. 2d 587, 592-94 (Fla. Dist. Ct. App. 2004)). In the Court's opinion, these cases cited by Plaintiffs Kohler, Zagami, and Jacobs "overly rel[y] upon contract theory to the point of losing focus of the nature of the claim made here, which asserts negligence, rather than breach of contract." *Caldwell*, 631 F.2d at 997; *see also MacPherson*, 111 N.E. at 1053.

position, the defendant's knowledge of a dangerous condition, and the ability to foresee the risk of harm. *See Caldwell*, 631 F.2d at 997, 998 n.12.

      As part of this fairness and policy inquiry in determining the existence of a duty in each particular case, courts generally consider multiple factors, such as

> (1) foreseeability of harm to plaintiff; (2) degree of certainty that plaintiff suffered injury; (3) closeness of connection between defendant's conduct and injury suffered; (4) moral blame attached to defendant's conduct; (5) policy of preventing future harm; (6) extent of burden to defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) availability, cost, and prevalence of insurance for the risk involved.

*Vu*, 538 F. Supp. at 29 (citation omitted); *accord* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 358 n.24 (5th ed. 1984) (cited with approval in *Haynesworth*, 645 A.2d at 1098). Policy reasons and fairness prevent holding HBC liable for the unforeseeable criminal actions of Mr. Alexis. It would be highly burdensome and contrary to the provisions of the HBC Contract,[47] to search the person and effects of everyone entering the Navy Yard premises, especially those authorized to enter Building 197. Under these circumstances, "[a] defendant may not be held liable for harm actually caused where the chain of events leading to the injury appears 'highly extraordinary in retrospect.'" *Morgan*, 468 A.2d at 1318 (quoting *Lacy*, 424 A.2d at 320-21).

---

[47] Because Mr. Alexis was assigned to work at the Navy Yard and was authorized to enter the premises, HBC was not required under the contract to search his person or possessions for weapons; instead, Mr. Alexis was subject to random search only. *See* HBC Contract at HBC 00054, 00070, 00211, and 00229.

Accordingly, the Court holds that HBC did not owe Plaintiffs Kohler, Zagami, and Jacobs a duty to protect them against the unforeseeable criminal acts of Mr. Alexis. The negligence claims against HBC will be dismissed.[48]

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the motions to dismiss filed by HPES and The Experts in each of the nine cases. It will also grant HBC's Motion to Dismiss in the cases involving Plaintiffs Kohler (Case No. 15-1636), Zagami (Case No. 15-1638) and Jacobs (Case No. 15-2242).

All claims against Defendants will be dismissed, with the exception of: (1) Plaintiffs' claims against HPES and The Experts for negligent retention and supervision of Mr. Alexis; and (2) the claims of Plaintiffs Kohler, Ridgell, Zagami, and Jacobs against HPES for negligent retention and supervision of The Experts.

A memorializing Order accompanies this Memorandum Opinion in each case.

Date: September 15, 2016

/s/
ROSEMARY M. COLLYER
United States District Judge

---

[48] As an additional basis for dismissal, the Court finds that the facts alleged do not support an inference that HBC breached any potential duty under the contract or at common law. Plaintiffs Kohler, Zagami, and Jacobs merely allege that HBC "fail[ed] to maintain Building 197 as a gun-free zone as required by law" and "to act with reasonable care under the circumstances." Kohler Compl. ¶ 113; Zagami Compl. ¶ 113; Jacobs Compl. ¶ 123. These allegations are bare statements that do not show that HBC was negligent in performing its security duties under the contract. Nothing in the Complaints supports an inference that: (1) Mr. Alexis *had* to be searched notwithstanding his authorization to enter the premises; (2) HBC failed to report the criminal conduct to the appropriate authorities; or (3) HBC failed to deter the criminal conduct of Mr. Alexis once he initiated his shooting spree. In fact, the Court notes that Officer Ridgell, an HBC security guard, was one of the fatal victims of the shooting. The Court need not accept as true the legal conclusion that HBC failed to act with reasonable care. *Iqbal*, 556 U.S. at 678.